Ann Hobart, Bar No. 019129
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone:  (602) 542-8347
Ann.Hobart@azag.gov
Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cynthia Sagers, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>Dr. Sethuraman Panchanathan; Arizona Board of Regents,<br><br>Defendants. | Case No:  CV21-00294-PHX-DWL<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

In 2018, Arizona State University ("ASU") appointed Plaintiff Cynthia Sagers ("Sagers") to a one-year administrative position and to a full professorship with tenure. The full-time administrative position was renewable contingent on Sagers' satisfactory performance and the continuing needs of the University. In 2020, Defendant Sethuraman Panchanathan ("Panch"), who had recruited Sagers, decided to terminate the administrative position based on unsatisfactory performance, and ASU reassigned her to full-time faculty status as a tenured full professor. Sagers alleges that Panch's decision was retaliation under the First Amendment, Title VII, and Title IX and gender discrimination under Title VII, Title IX, and the Fourteenth Amendment.

Defendant Arizona Board of Regents ("ABOR") and Panch (collectively, "Defendants") request summary judgment on all of Sagers' alleged claims. Her retaliation claims fail because her complaint to an HR professional about her working environment was not protected activity under any federal law, and even if it had been, she has no evidence that Panch knew of (much less acted upon) her complaint. Her discrimination claims fail because she has no evidence that the decision to terminate the administrative appointment or any other employment action had anything to do with her

gender. On the contrary, the uncontroverted record shows that Panch based his decision on Sagers' failure to satisfactorily fulfill the administrative duties that he had recruited her to perform.

## I.       Factual Background.

### A.  Panch Recruited Sagers to a One-Year Appointment as Vice President of Research in ASU's Knowledge Enterprise.

In May 2018, Panch recruited Sagers to apply for the position of Vice President of Research ("VPR") in what is now known as Knowledge Enterprise ("KE"). (Ex. 1 [Sagers Dep. Trans.] at 13:8-14:7; 20:23-21:4; Ex. 2 [Panch Dep. Trans.] at 64:8-19, 86:1-87:4, 95:10-17) KE is an administrative organization within ASU that advances research, corporate engagement, entrepreneurship and innovation, strategic partnerships, and international development. (Ex. 2 at 25:8-26:1) In 2018, Panch was KE's Executive Vice President ("EVP") and one of three executive vice presidents on ASU president Michael Crow's executive team. (Ex. 2 at 84:21-85:7) He was looking for a leader for KE's research unit who could help reach Crow's goal of achieving 815 million dollars in annual research expenditures by 2025. (Ex. 1 at 22:3-23:1; Ex. 2 at 41:10-43:8, 72:12-73:4, 92:2-93:3, 290:11-291:8)

Research expenditures are monies spent on research or development activities as defined by the National Science Foundation ("NSF").  (Ex. 3 [Magee Dep. Trans.] at 16:6-9) Panch calculated that to achieve Crow's research expenditures goal, ASU would need to increase the research funding that it brought into the University by seven to ten percent year over year. (Ex. 2 at 200:10-201:2) KE generally classifies research projects for which the University receives funding into four tiers. (Ex. 2 at 44:9-45:5) Tier 1 encompasses small projects of less than one million dollars in funding, which are generally led by individual faculty members within an academic unit with help from KE and the college of which the unit is a part. (Ex. 2 at 45:16-46:4, 51:18-52:5) Tier 2 projects receive between one and twenty million dollars in total funding and are led by ASU colleges with help from their constituent academic units and KE. (Ex. 2 at 46:5-

47:18; 52:6-10) Tier 3 projects involve tens of millions of dollars in funding; Tier 4 projects receive funding in excess of seventy-five million dollars. (Ex. 2 at 47:19-48:20) Tier 3 and Tier 4 projects are led by KE or one of ASU's research institutes with help from the University's colleges and academic units. (Ex. 2 at 52:11-22; 33:19-34:2) Although ASU is working to develop Tier 3 and even Tier 4 projects, the great majority of ASU's research activity falls in Tiers 1 and 2. (Ex. 2 at 383:19-384:10)

When Panch approached Sagers about the VPR position, he already had a senior advisor from the Biodesign Institute (Neal Woodbury) who was charged with advancing Tier 3 and, potentially, Tier 4 opportunities. (Ex. 2 at 268:9-269:11, 272:11-21) What Panch needed to achieve ASU's research expenditures goal was a VPR who could establish a "solid foundation" for ASU's "research enterprise" in Tier 1 and 2 projects from which larger-scale projects might be built. (Ex. 2 at 52:15-22, 72:12-73:4) Panch believed that Sagers experience as the VPR and a tenured professor at Oregon State University, where Panch understood Sagers was responsible for what ASU defined as Tier 1 and Tier 2 projects, gave her relevant experience. (Ex. 1 at 16:12-22, 37:3-38:2; Ex. 2 at 72:12-73:4; 92:2-93:3) Moreover, Panch believed that, as a tenured full professor, Sagers could provide the "strong faculty and academic leadership" that was necessary to maximize ASU's research productivity. (Ex. 2 at 254:15-255:7) ASU was adding approximately 130 to 140 faculty members annually and the potential for increasing its research portfolio was growing accordingly, particularly in Tiers 1 and 2. (Ex. 2 at 260:22-261:8, 379:10-380:17)

On July 27, 2018, Sagers received and accepted ASU's and KE's offer of a full-time "administrative appointment as VPR, effective September 20, 2018, and Professor with tenure in the College of Integrative Sciences and Arts ["CISA"]." (Ex. 1 at 85:11-86:12; Ex. 4 [Ex. 2 to Sagers' Dep. (July 27, 2018 Offer Letter)] at DF0001) The administrative position was for a one-year term, renewable "contingent upon satisfactory performance and the needs of the university." (Ex. 4 at DF0001)

**B.  Sagers' Work Performance Fell Short During Her First Year as KE VPR.**

As stated in her offer letter, the first of Sagers' responsibilities as KE VPR was to "[d]evelop and execute a strategy to maximize the research productivity of faculty and academic units to ensure continued growth of the ASU research enterprise." (Ex. 4 at DF0001) To evaluate Sagers' performance in this regard, Panch looked to the relationships she was building with and among ASU faculty. For Tier 1, Panch considered "how the deans and faculty felt that they [were] being helped in terms of advancing their aspiration, because they all have good ideas, but they need help to turn those ideas into successful projects." (Ex. 2 at 53:1-14) For Tier 2, Panch considered the number of research centers that the University was establishing with KE's assistance, whether Sagers was bringing groups of people to work together on problems, and whether she was being mindful of the needs of faculty in fields other than science, engineering, and technology. (Ex. 2 at 54:1-15)

Panch also considered the monthly reports on ASU's research activity, with a particular interest in the data indicating whether or not (1) the dollar volume of research proposals being submitted for funding was increasing at a sufficient rate to reach ASU's research expenditure goal; and (2) the number of faculty who were writing research proposals (and thereby becoming principal investigators or PIs) was growing proportional to the increase in ASU faculty. (Ex. at 2, 53:1-54:15, 104:4-105:5, 129:2-130:13, 287:13-288:13, 298:13-299:20) Only about 25% to 30% of proposals succeed in receiving funding, so to achieve ASU's goal of increasing the research dollars coming into the University by seven to ten percent annually, ASU would need to increase the dollar volume of research proposals by three to four times that amount. (Ex. 2 at 200:2-201:14)

Based on these measures, by late spring 2019 Panch was not "completely satisfied" with Sagers' performance as VPR. (Ex. 2 at 104:4-8, 104:17-105:5, 106:3-13) Generally speaking, "things were not happening as intensely as [he] had hoped for." (Ex. 2 at 106:3-11) Panch was receiving complaints from deans in the colleges of

4

1    engineering and the liberal arts and sciences – "two large colleges that are most

2    important ones" – that Sagers was not providing them the help they needed to advance

3    their research agendas. (Ex. 2 at 107:9-109:6) Panch was also receiving data showing

4    that the dollar volume of research proposals and the number of PIs involved in the

5    projects were not increasing at the rate he desired. (Ex. 2 at 104:17-105:5)

6        Nevertheless, Panch renewed Sagers' VPR appointment when it expired at the

7    end of June 2019, in part, to give her more time to bring her performance up to his

8    expectations. (Ex. 2 at 104:4-15, 113:15-114:5, 114:10-115:4) To that end, Panch

9    emphasized to Sagers the importance of being attentive to the needs of the colleges of

10   engineering and liberal arts and sciences, where "much of the growth possibilities" in

11   Tiers 1 and 2 are to be found. (Ex. 2 at 108:13-110:2) Panch also gave Sagers guidance

12   on what might be "easier targets" for achieving KE's research funding goals, including

13   Research Experience for Undergraduates awards or REUs. (Ex. 2 at 133:1-13, 135:22-

14   136:5, 136:17-137:22, 261:17-262:8) REUs are NSF grants that supplement existing

15   awards to bring undergraduates into the research enterprise, and they do not go through

16   the typical proposal review process, meaning they could be awarded in a matter of weeks

17   or months. (Ex. 1 at 99:12-24; Ex. 2 at 133:17-134:17) If ASU obtained REUs in

18   sufficient numbers, it could significantly move the needle on ASU's goal for increasing

19   research expenditures and provide Sagers with "quick wins." (*Id.;* Ex. 2 at 135:15-21)

20   **C. Sagers Discussed the KE Work Environment with the HR Director.**

21       While Sagers was VPR, KE Human Resources Director Elaina Harrington

22   regularly held individual meetings with Panch's executive team members to discuss any

23   issues (including any "employee relation problems") that they may be having. (Ex. 5

24   [Harrington Dep. Trans.] at 11:20-13:2, 24:13-25:18) At one of these regularly scheduled

25   meetings, on August 28, 2019, Sagers discussed with Harrington how the working

26   environment at KE was "very challenging and difficult" and "how anxious so many

27   people were in the office." (Ex. 1 at 61:8-62:22) From Sagers' perspective, "people that

28   were in the office were fearful that they'd be fired if they didn't to[e] the line." (Ex. 1 at

1    62:13-63:19) Sagers testified that she doubted that anything she said about a "culture of

2    fear" at KE was surprising to Harrington. (Ex. 1 at 68:19-69:19) Similarly, Harrington

3    does not recall Sagers mentioning any "specific examples" of employees feeling

4    "uncomfortable" in the KE environment and confirms that the culture-of-fear concept

5    "wasn't a novel issue." (Ex. 5 at 25:19-28:6, 32:9-24) Panch denies hearing that Sagers

6    expressed concerns about the KE working environment. (Ex. 2 at 148:11-149:6) Sagers

7    has no evidence to the contrary. (Ex. 1 at 76:13-77:23)

8         **D.  Two of Sagers' Subordinates Complained About Her.**

9         In October 2019, two of Sagers' staff – Stacy Esposito, whom Sagers recruited to

10   be an executive director at KE, and Kari Buice, who was Sagers' administrative assistant

11   from the time she began as the KE VPR – complained to Harrington and Adriana Kuiper,

12   who was Panch's chief of staff, about the "negative work environment" that Sagers had

13   been creating for them for some time. (Ex. 5 at 53:16-54:3, 62:7-24, 72:6-74:9; Ex. 6

14   [Esposito Dep. Trans.] at 10:19-12:22, 30:17-31:15; Ex. 7 [Buice Dep. Trans.] at 12:6-

15   13:8; Ex. 8 [Kuiper Dep. Trans.] at 16:8-22, 17:7-20:20) Both reported that Sagers

16   would give them instructions and then criticize them for following them, which implied

17   that they acted in her name without her authorization. (Ex. 8 at 18:1-16; Ex. 6 at 24:25-

18   25:11; Ex. 7 at 23:23-26:7; Ex. 9 [Stacy Esposito meeting notes (Harrington Dep. Ex. 2,

19   DF0025)]; Ex. 10 [Kari Buice meeting notes (Harrington Dep. Ex. 3, DF0024)]) They

20   also reported that Sagers "would frequently verbally demonstrate frustration and anger

21   and lash out at them." (Ex. 8 at 18:14-16, 19:1-2; Ex. 6 at 28:2-29:7; Ex. 7 at 26:8-27:13;

22   Ex. 9; Ex. 10) Esposito reported that she would sometimes propose a course of action to

23   Sagers, who would initially dismiss the proposal in derogatory terms but subsequently

24   take credit for it as her own. (Ex. 8 at 18:17-21; Ex. 6 at 21:19-22:2, 35:7-36:4; Ex. 9)

25   Esposito also reported that Sagers disparaged some of their KE colleagues, including

26   Panch, in a sarcastic, unprofessional tone. (Ex. 6 at 18:24-23:9, 30:17-33:10; Ex. 9)

27        Having received similar complaints about Sagers' conduct from two different

28   staff members, Harrington concluded that the situation was "urgent and something [had

to] be done." (Ex. 5 at 73:24-74:6) She and Kuiper met with Sagers to discuss the complaints and instructed Sagers to postpone one-on-ones with Esposito and Buice while KE addressed their concerns. (Ex. 5 at 81:7-83:19) Harrington, Kuiper, and Sagers then had separate meetings with Buice and Esposito to discuss next steps. (Ex. 5 at 84:22-86:25) In Harrington's view, the meeting with Buice was "uncomfortable" because she was candid about what was not "going well" in her interactions with Sagers, but she was willing to work with Sagers to improve their interactions. (Ex. 5 at 85:9-86:10) Esposito, on the other hand, was too uncomfortable to discuss her issues with Sagers, and Harrington and Kuiper "just stopped [their] meeting." (Ex. 5 at 86:11-87:5)  In her initial interview with Harrington on October 11, 2019, Esposito stated that she did not want to work with Sagers anymore (Ex. 6 at 33:11-24; Ex. 9) After the unproductive follow-up meeting with Sagers, KE reassigned Esposito to report to Tamara Deuser, KE's Chief Operations Officer. (Ex. 6 at 33:25-34:3; Ex. 1 at 18:21-24)

**E.  Panch Changed Sagers' Appointment Based on Her Performance.**

As 2020 approached, Sagers' performance as VPR did not improve as Panch had hoped. (Ex. 2 at 192:4-193:1) Rather than increase at a rate to enable annual growth in research funding of between seven and ten percent, the dollar volume of research proposals decreased by roughly ten percent, from two billion dollars in 2018 (notwithstanding Sagers' deficient performance in September, November, and December as compared to those same months in 2017) to just over 1.8 billion in 2019 (throughout which time Sagers was KE's VPR). (Ex. 2 at 290:16-292:12; Ex. 11 [Magee's Decl.] & Ex. A thereto at DF0533) The number of PIs increased by less than three percent, which was far from the growth rate that Panch expected given the annual additions to faculty at ASU. (Ex. 2 at 378:16-380:17; Ex. A to Ex. 11 at DF0533-34) Moreover, Sagers had failed to follow through on Panch's advice for generating more research funding by, for example, systematically pursuing REUs. (Ex. 2 at 192:19-193:1) On the contrary, Sagers claims to have told Panch that REUs were such small awards "that it was a waste of a VPR salary" to pursue them. (Ex. 1 at 102:11-103:2, 103:18-19) So Sagers asked a

1   subordinate to come up with a "strategy" for obtaining more REUs. (Ex. 1 at 107:21-

2   108:7) What Panch expected of Sagers as VPR, however, was not just a strategy but also

3   implementation, which he did not receive. (Ex. 2 at 205:12-22)

4          Based on this evidence of unsatisfactory performance, Panch decided to terminate

5   Sagers' position as VPR and informed her of that decision in a meeting on January 2,

6   2020. (Ex. 2 at 193:2-5) As confirmed in a letter dated January 7, 2020, Panch decided to

7   temporarily change Sagers' administrative appointment to a half-time position as "Vice

8   President of Knowledge Enterprise Development (KED) Campus Director at the

9   Polytechnic Campus ["Poly"]" effective January 13, 2020.  (Ex. 1 at 220:8-221:6; Ex. 12

10  [Sagers' Dep. Ex. 11, January 7, 2020, appointment letter (DF0039)]) Eventually, Sagers

11  was to – and did – return to full-time faculty status in CISA. (Ex. 1 at 236:12-22; 237:16-

12  240:20)

13  **II.     Legal Argument.**

14         **A. Sagers Lacks Facts to Support a First Amendment Retaliation Claim.**

15         In Count I of the First Amended Complaint ("FAC"), Sagers asserts a § 1983

16  claim against Panch alleging that he violated her First Amendment rights by retaliating

17  against her for "reporting his illegal, improper, and discriminatory conduct" to

18  Harrington on August 28, 2019.  (Doc. 16, ¶¶ 15, 51)  The evidence contradicts these

19  allegations.  At her deposition, Sagers testified that "[t]he discussion with [Harrington]

20  that day was during a regularly scheduled one-on-one, and it was less about Panch and

21  more about the climate of the office."  (Ex. 1 at 57:14-22)  Thus, to survive summary

22  judgment on her First Amendment retaliation theory, Sagers must show that (1) the KE

23  office climate is a matter of public concern; (2) she met one-on-one with Harrington as a

24  private citizen rather than a public employee; and (3) what she said to Harrington on

25  August 28, 2019 was a "substantial or motivating factor" for any adverse employment

26  action that Panch may have taken against her.  *See Coomes v. Edmonds Sch. Dist. No.*

27  *15*, 816 F.3d 1255, 1259 (9th Cir. 2016) (citing *Eng. v. Cooley,* 552 F.3d 1062, 1070 (9th

28  Cir. 2009)) (internal quotation marks omitted).  Failure to demonstrate a single one of

1    these factors is fatal to Sagers' claim. *Dahlia v. Rodriguez,* 735 F.3d 1060, 1067 n.4 (9th

2    Cir. 2013).  Because Sagers cannot establish any one of them, her First Amendment

3    retaliation claim fails as a matter of law.

4                    **1.  The KE work environment is not a matter of public concern.**

5            The "essential question" in determining whether Sagers spoke on a matter of

6    public concern at the August 28, 2019, meeting "is whether [her] speech addressed

7    matters of 'public' as opposed to 'personal' interest."  *Desrochers v. City of San*

8    *Bernardino,* 572 F.3d 703, 709 (9th Cir. 2009) (quoting *Connick v. Myers*, 461 U.S. 138,

9    147 (1983)).  This "inquiry is purely a question of law" on which Sagers bears the

10   burden of proof.  *Eng,* 552 F.3d at 1070.  Whether speech involved an issue of public

11   concern depends on its "content, form, and context . . . as revealed by the whole record."

12   *Connick*, 461 U.S. at 147-48.  The speech's content is "the greatest single factor in the

13   *Connick* inquiry."  *Desrochers,* 572 F.3d at 710 (internal citations and quotation marks

14   omitted).  To address a matter of public concern, Sagers' speech must have involved

15   "issues about which information is needed or appropriate to enable the members of

16   society to make informed decisions about the operation of their government."  *Id.*

17           The record does not indicate that Sagers discussed any such weighty issues with

18   Harrington.  Sagers does not recall the "specifics of the conversation" (Ex. 1 at 62:8-20),

19   and Harrington cannot recall it "word-for-word," either (Ex. 5 at 27:13-15).  Harrington

20   recalls that she and Sagers "discuss[ed] the culture and how it was uncomfortable and

21   that employees seemed to be fearful."  (Ex. 5 at 27:13-28:6)  Sagers' recollections of

22   their conversation are similarly vague: "We mostly talked about the – the broader

23   environment and how anxious so many people were in the office."  (Ex. 1 at 62:18-22)

24   When asked if she was one of the people who was anxious, Sagers volunteered that her

25   job was "very demanding," "[t]here were days when [she] did not have the freedom to

26   use the toilet until 2:00 o'clock in the afternoon, [and she] very often went without

27   lunch."  (Ex. 1 at 62:23-63:4)  It is unclear whether Sagers shared this personal

28   information with Harrington, but even if she did, it was not of a kind to qualify their

                                                    9

discussion for First Amendment protection.  "[S]peech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of governmental agencies is generally not of public concern."  *Desrochers,* 572 F.3d at 710 (internal citations and quotation marks omitted).

Similarly, the form of Sagers' speech does not lend itself to a finding of public concern.  Sagers testified that she discussed the KE working environment in "a regularly scheduled one-on-one" with a KE HR representative.  (Ex. 1 at 57:14-22)  Nothing in the record suggests that Sagers shared her concerns with the public.  "Because the speech at issue here took the form of [at most, an] internal employee grievance[ that] w[as] not disseminated to the public, this portion of the *Connick* test [also] cuts against a finding of public concern."  *Desrochers,* 572 F.3d at 715 (internal citations and quotation marks omitted).

Finally, the meeting on August 28, 2019 occurred in the context of Panch's and Sagers' mutual disappointment with her tenure as VPR.  Panch had not been satisfied with Sagers' work performance since the late spring (Ex. 2 at 104:4-8, 104:17-105:5, 106:3-13), and Sagers had been "frustrated with the [VPR] position" since at least May (Ex. 1 at 176:11-177:20).  In this context, Sagers' speech "merely reflects [her] dissatisfaction with [her] employment situation, a conclusion which weighs against a finding of public concern."  *Desrochers,* 572 F.3d at 717 (internal citations and quotation marks omitted).

## 2.  Sagers spoke to Harrington as a public employee.

Sagers' speech also is not constitutionally protected because she spoke with Harrington "pursuant to [her] employment responsibilities" as KE VPR.  *Coomes*, 816 F.3d at 1260.  As the Supreme Court explained in *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006), "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  The August 28, 2019, conversation occurred "during a regularly scheduled one-on-one"

meeting that Harrington had called specifically to ascertain whether Sagers, as a KE executive, was aware of issues that required HR's attention.  (Ex. 1 at 57:14-22; Ex. 5 at 24:13-25:18)   Moreover, Sagers admits that as VPR she had a responsibility to bring forward complaints about the KE working environment that she had heard from lower-ranking employees.  (Ex. 1 at 256:3-257:11)  Accordingly, when she "reported" to Harrington "that there was a culture of fear" at KE on August 28, 2019, she spoke as a public employee, not as a private citizen, and her speech did not implicate First Amendment protection.  (Ex. 1 at 68:19-69:19)

### 3. Sagers has no evidence that her speech motivated Panch to take an adverse employment action against her.

Sagers' First Amendment retaliation claim also fails because she has no evidence that Panch even knew about her conversation with Harrington, much less that it motivated him to take an adverse action against her.  Panch testified under oath that, prior to the litigation, he was not aware that Sagers had complained about a "culture of fear" at KE (Ex. 2 at 148:11-149:6), and Sagers admits that she has no evidence to contradict his testimony (Ex. 1 at 76:13-77:23). Sagers therefore cannot establish that her speech was a substantial or motivating factor for any adverse employment action that Panch may have taken against her.  *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1727-28 (2019) (finding First Amendment retaliation claim could not survive summary judgment because plaintiff lacked evidence that defendant knew of plaintiff's prior speech).  For this additional reason, Sagers' First Amendment retaliation claim fails as a matter of law.

### 4. Panch is entitled to qualified immunity.

Even if Sagers could establish a First Amendment claim, which she cannot, Panch is entitled to qualified immunity because Sagers has not shown that he violated a clearly established right.  A constitutional right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015).  This requires the court to determine whether a government official had fair notice that their conduct would violate a constitutional right.

11

1    *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Ashcroft v. al-Kidd*, 536 U.S. 731, 743 (2011)

2    (qualified immunity "protects all but the plainly incompetent…").

3          Here, the purported right to speak on "the climate of the office" is not a clearly

4    established right under the First Amendment.  Thus, Panch is entitled to qualified

5    immunity.  *Todd v. U.S.*, 849 F.2d 365, 370 (9th Cir. 1988) (The right to be considered

6    "is not a general constitutional guarantee… but its application in a particular context.").[1]

7          **B.  Sagers Has No Evidence of Title VII and Title IX Retaliation.**

8          Although Sagers has not separately pled retaliation claims in her claims for

9    gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and

10   Title IX of the Education Amendments of 1972 ("Title IX"), she does allege that at her

11   meeting with Harrington on August 28, 2019, she complained that Panch had subjected

12   her to "discriminatory treatment based on gender" and that because of that complaint, he

13   recommended that she be "demoted" from the VPR position.  (Doc. 16, ¶¶ 15, 73-76, 98-

14   101)  To survive summary judgment on her inchoate retaliation claims, Sagers must be

15   able to substantiate the allegations that (1) she engaged in protected activity by

16   complaining of gender discrimination to Harrington at their August 28, 2019, meeting;

17   *and* (2) Panch decided to terminate her appointment as KE VPR because of her

18   complaint.  *See Campbell v. Hawaii Dep't of Ed.*, 892 F.3d 1005, 1012 (2018).  She

19   cannot.

20         As discussed above, Sagers' August 28, 2019, conversation with Harrington was

21   about the anxiety that, in Sagers' view, many employees (both men and women) felt

22   about their ability to satisfy KE's high performance expectations.  (Ex. 1 at 63:25-65:9)

23   Moreover, Harrington denies that Sagers mentioned anything about disparate treatment

24   of men and women at KE during this meeting.  (Ex. 5 at 37:11-14)  Title VII does not

25

26   [1] Similarly, the right to assert an equal protection retaliation claim is not clearly
     established. *See, e.g., Fountain v. Arizona*, 2021 WL 5014090, at *4 (D. Ariz. Oct. 28,
27   2021) (*citing Ballou v. McElvain,* 2021 WL 4436213, at *10 (9th Cir. Sept. 28, 2021)
     (*amended on other grounds in Ballou,* 29 F.4th 413, 428 (9th Cir. 2022))). Therefore, to
28   the extent Sagers is alleging such a claim (*see* Doc.16, ¶ 51), Panch enjoys qualified
     immunity from it and the Court should dismiss it.

1  prohibit an employer from having high performance expectations for its employees

2  regardless of their gender or other protected status.  Accordingly, Sagers cannot show

3  that she engaged in protected activity, which is fatal to her Title VII and Title IX

4  retaliation claims.  *See, e.g., Coleman v. Home Health Resources Inc.,* 269 F. Supp. 3d

5  935, 941-42 (D. Ariz. 2017) (finding that complaining about a salary freeze without

6  implying that the freeze was being disparately applied based on gender was not protected

7  activity under Title VII).

8         Furthermore, even if Sagers had complained of gender discrimination, she could

9  not establish that her complaint caused Panch to terminate her VPR appointment because

10  there is no evidence that he knew of her complaint beforehand.  *See, e.g., Clark Cnt'y

11  Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (finding plaintiff failed to establish

12  causation element in part because there was "no indication" decision-maker knew of

13  protected activity before taking adverse action).  At deposition, Panch denied "hear[ing]

14  any complaints that Dr. Sagers reported that there was disparate treatment of men and

15  women" at KE.  (Ex. 2 at 150:10-14)  Sagers has no evidence to contradict this

16  testimony.  For this additional reason, her Title VII and Title IX retaliation claims fail as

17  a matter of law.

18         **C.  Sagers Has No Evidence of Gender Discrimination.**

19         In the FAC, Sagers alleges claims for gender discrimination against ABOR under

20  Title VII (Count III) and Title IX (Count IV), and against Panch under § 1983 and the

21  equal protection clause of the Fourteenth Amendment (Count I).  (Doc. 16, ¶¶ 43-52, 62-

22  86, 87-111)[2]  Specifically, Sagers complains that she was treated less favorably than

23  Neal Woodbury, whom she alleges succeeded her in the VPR position and supplanted

24  her in the "line of succession" to be EVP when Panch left to head the NSF, although (she

25  claims) he was less qualified and was not performing as well as she was.  (Doc. 16,

26

27  [2] Sagers initially alleged Count III and Count IV against all Defendants.  But following
   Defendants' motion, she voluntarily dismissed Panch from those counts.  (Doc. 20 at 4)
28  This Court also dismissed Sagers' Count II, which alleged violation of Arizona's
   whistleblower statute, A.R.S. § 38-532.  (*Id.* at 5)

¶¶ 23, 40, 39-40, 50, 63-72, 89-97)  Sagers also alleges that she was treated less favorably because she was assigned to work on Tier 1 and Tier 2 projects, while Woodbury was not.  These allegations are without any factual or legal basis.

### 1.  ASU did not select Woodbury over Sagers.

To the extent Sagers' allegations are styled as a failure-to-promote claim or to say that she was replaced by a lesser-qualified male, her claims fail.  Woodbury did not succeed Sagers as VPR; he just took on her responsibilities in addition his own.  (Ex. 8 at 40:17-41:1)  Moreover, Woodbury did not succeed Panch; he just served as interim EVP until ASU hired Sally Morton to fill the position on a permanent basis.  (Ex. 8 at 38:19-39:16)  The fact that a female was hired for the EVP position entirely disposes of Sagers' allegations of gender discrimination with respect to that position.  *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005) (*prima facie* failure-to-promote claim includes a showing that "the employer filled the position with an employee not of plaintiff's class").

### 2.  Woodbury was not similarly situated to Sagers.

To the extent Sagers is alleging a disparate treatment claim, it too fails.  Because Sagers lacks direct evidence of discrimination, allegations of gender-based disparate treatment under Title IX and the equal protection clause are analyzed using the *McDonnell-Douglas* burden-shifting analysis applied to Title VII cases.  *See Campbell*, 892 F.3d at 1012, 1023-24 (discussing applicability of Title VII standards to Title IX claims); *Ballou v. McElvain,* 29 F.4th 413, 422 (9th Cir. 2022) (discussing use of *McDonnell-Douglas* analysis in equal protection cases).  As a result, to prevail on any of her discrimination theories, Sagers must first show, among other things, that similarly situated individuals outside her protected class were treated more favorably or other circumstances that give rise to an inference of discriminatory intent.  *See*, *Campbell*, 892 F.3d at 1012.  To be similarly situated, employees must be similar in all material respects. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010).

1    Woodbury and Sagers were not similarly situated.  First, Sagers and Woodbury
2  had different jobs, duties, experiences, and expectations.  Sagers was the VPR,
3  responsible for developing Tier 1 and Tier 2 projects, and the measure of her success was
4  tied to building relationships with faculty and deans and increasing proposal dollar
5  amounts and the number of PIs.  (Ex. 1 at 104:24-105:1, 204:24-205:2; Ex. at 2, 53:1-
6  54:15, 104:4-105:5, 129:2-130:13, 287:13-288:13, 298:13-299:20)  Woodbury was a
7  senior advisor assigned to advancing Tier 3 and, potentially, Tier 4 opportunities, and the
8  measure of his success was tied to building relationships with outside agencies and
9  "getting ready for bigger things." (Ex. 2 at 269:7-11, 272:8-14, 277: 9-278:5, 279:6-15)
10 Panch chose Sagers and Woodbury for their respective positions for the "different kinds
11 of expertise they br[ought] to the table."  (Ex. 2 at 276:7-277:8)  He chose Sagers
12 because of her previous experience with Tier 1 and Tier 2 projects as VPR and professor
13 at OSU.  (*Id.*, 92:2-93:3, 254:15-255:7)  He chose Woodbury because (among other
14 reasons) he had "25-plus years at ASU," had been deputy director of the Biodesign
15 Institute, was a "very strong researcher" and the "chief architect of a major tier three to
16 tier four project" with the Department of Energy, and was an entrepreneur who had
17 formed his own company with funds from the federal Defense Threat Reduction Agency.
18 (Ex. 2 at 270:6-274:3, 277:9-278:5)  *See, e.g., Mack v. Calif. Dept. of Corrs. and Rehab*.,
19 790 Fed. Appx. 846, 849 (9th Cir. 2019) (employees not similarly situated because they
20 held different positions).

21    Second, Woodbury and Sagers did not exhibit similar conduct.  Woodbury met
22 Panch's expectations for Tier 3 and Tier 4. (Ex. 2 at 279:6-15)  But as discussed in
23 section I.E, Sagers did not meet Panch's expectations for advancing the Tier 1 and 2
24 agenda.  Thus, Woodbury is not an appropriate comparator for purposes of Sagers'
25 discrimination claim.  *Bastidas v. Good Samaritan Hosp. LP*, 774 Fed. Appx. 361, 363-
26 64 (9th Cir. 2019) (holding that employees were not similarly situated where they did not
27 engaged in problematic conduct of comparable seriousness).

28

15

1    Sagers can point to no other circumstances giving rise to an inference of

2    discrimination.  Thus, Sagers' gender discrimination claims fail.

3                    **3.  Sagers cannot establish pretext.**

4        Because Sagers cannot establish a *prima facie* case of gender discrimination,

5    ABOR need not articulate a legitimate, non-discriminatory reason for removing her from

6    the VPR position. *See Campbell,* 892 F.3d at 1012 (discussing what triggers burden-

7    shifting under the *McDonnell-Douglas* framework).  Nonetheless, Defendants have

8    explained in detail why Panch decided to remove her.  (*See* section I.E)

9        Significantly, even if the parties were required to reach this point in the analysis,

10   Sagers cannot establish that ABOR's reason is a pretext for discrimination.  Where the

11   same individual is responsible for both the hiring of and an adverse employment decision

12   against an employee, "and both actions occur within a short period of time, a strong

13   inference arises that there was no discriminatory action."  *Bradley v. Harcourt, Brace &*

14   *Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996).  Because Panch had "previously shown a

15   willingness to treat [Sagers] favorably" by recruiting her to the VPR position, ABOR is

16   entitled to the "same actor inference" that these reasons (and not gender bias) were the

17   basis for removal.  *Coghlan v. Am. Seafoods Co.,* 413 F.3d 1090, 1096-97 (9th Cir.

18   2005).  To overcome the same-actor inference requires an "extraordinarily strong

19   showing of discrimination."  *Id.* at 1097.   Sagers' evidence for gender discrimination is

20   unquestionably deficient, and summary judgment is warranted.  *Coghlan*, 413 F.3d at

21   1096-98 (stating that the same-actor inference must be considered on a summary

22   judgment motion and affirming summary judgment on that basis); *Schechner v. KPIX-*

23   *TV*, 686 F.3d 1018, 1027 (9th Cir. 2012) (affirming grant of summary judgment based on

24   the plaintiff's inability to overcome the same-actor inference).

25            **4.  Sagers' Title IX claim fails for an additional reason.**

26       Before Sagers can collect monetary damages (the only damages she seeks against

27   ABOR) under Title IX, she must demonstrate that "an official who at a minimum has

28   authority to address the alleged discrimination and to institute corrective measures on the

1    recipient's behalf has actual knowledge of discrimination in the recipient's programs and

2    fails to adequately respond."   *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290

3    (1998). To survive summary judgment on this issue, Sagers must present sufficient

4    evidence that she provided actual notice to an official at ASU with authority to take

5    corrective action and that ASU's response was deliberately indifferent.  *Workman v.*

6    *Univ. of Akron,* No. 5:16-cv-156, 2017 WL 6326898, at *11 (N.D. Oh. Dec. 11, 2017).

7    Deliberate indifference occurs only where the response to the alleged discrimination "is

8    clearly unreasonable in light of the known circumstances." *Reese v. Jefferson Sch. Dist.*

9    *No. 14J,* 208 F.3d 736, 739 (9th Cir. 2000) (quoting *Davis v. Monroe Cty. Bd. of Educ.,*

10   526 U.S. 629,648 (1999)).

11          In April 2020, Sagers' counsel sent a letter to the Title IX coordinator in ASU's

12   Office of University Rights and Responsibilities ("OURR"), alleging that her

13   reassignment to Poly amounted to illegal retaliation and discrimination.  (Ex. 1 at 11:17-

14   23)  Prior to that time, Sagers had not alleged any discriminatory conduct.  OURR took

15   immediate action to open an investigation and interviewed Sagers and others concerning

16   her allegations.  (Ex. 1 at 12:9-17)  There is no evidence that ASU treated these

17   allegations with deliberate indifference.  For this additional reason, Sagers' Title IX

18   claim fails.

19   **III.    Conclusion**

20          The Court should grant Defendants' motion and enter summary judgment on all

21   of Sagers' alleged claims.

22          Respectfully submitted this 4th day of November, 2022.

23                                                        Arizona Attorney General's Office

24

25                                                        /s/  Ann Hobart
                                                          _____
26                                                        Ann Hobart
                                                          Assistant Attorney General
                                                          Attorneys for Defendants

27

28

1   I certify that I electronically
    transmitted the attached document
2   to the Clerk's Office using the
    CM/ECF System for filing this
3   4th day of November, 2022, and service on:

4   George W. Seibt
    Alexandra Mijares Nash
5   Rutila, Seibt & Nash, PLLC
    6803 E. Main Street, Suite 1116
6   Scottsdale, AZ  85251
    greg@rsnlawaz.com
7   ali@rsnlawaz.com
    Attorneys for Plaintiff
8
    COPY of the foregoing mailed this
9   4th day of November, 2022, to:

10  The Honorable Dominic W. Lanza
    U.S. District Court, Suite 621
11  401 W. Washington Street, SPC 46
    Phoenix, AZ 85003-2151
12
    /s/     Deb Sawyer
13  10803626

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28