**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cynthia Sagers, | No. CV-21-00294-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona State University, et al., | |
| Defendants. | |

## INTRODUCTION

In July 2018, Dr. Cynthia Sagers ("Dr. Sagers") was hired by Arizona State University ("ASU") as a tenured professor. Additionally, Dr. Sagers was named the vice president of research ("VPR") of ASU's Knowledge Enterprise ("KE"), which is an administrative organization within ASU that advances research, corporate engagement, entrepreneurship and innovation, strategic partnerships, and international development. As to that position, Dr. Sagers's direct supervisor was Dr. Sethuraman Panchanathan ("Dr. Panchanathan").

In this action, Dr. Sagers alleges that Dr. Panchanathan engaged in a pattern of discriminatory conduct toward female employees, including herself, and created a culture of fear and intimidation. She further alleges that she reported Dr. Panchanathan's behavior to members of ASU's human resources ("HR") department in the latter half of 2019 and that, shortly thereafter, Dr. Panchanathan retaliated against her by assigning her tasks outside the scope of her employment and qualifications and then failing to renew her VPR

appointment.  Based on these allegations, Dr. Sagers asserts retaliation and discrimination claims under 42 U.S.C. § 1983 against Dr. Panchanathan as well as similar claims under Title VII and Title IX against the Arizona Board of Regents ("ABOR") (together with Dr. Panchanathan, "Defendants").

Now pending before the Court is Defendants' motion for summary judgment.  (Doc. 49.)  For the following reasons, the motion is granted.

## BACKGROUND

I.   <u>Facts</u>

The following facts are derived from the parties' summary judgment submissions and other materials in the record and are uncontroverted unless otherwise noted.

In 2018, Dr. Panchanathan was the Executive Vice President ("EVP") of KE.  (Doc. 49-1 at 31-32.)[1]  At that time, ASU President Michael Crow had set a goal of achieving $815 million in annual research expenditures by 2025.  (*Id.* at 7.)  Dr. Panchanathan was responsible for creating and implementing a strategy to reach President Crow's goal.  (*Id.* at 31.)

To that end, in the spring of 2018, Dr. Panchanathan sought to hire a VPR to increase ASU's research funding.  (*Id.* at 5.)  In May 2018, he approached Dr. Sagers about applying for the position.  (*Id.* at 4-5, 40.)  At the time, Dr. Sagers worked for Oregon State University.  (*Id.* at 9-10.)

Around June 2018, Dr. Sagers visited Arizona and met with various ASU administrators and other staff, including Dr. Panchanathan.  (*Id.* at 5-6.)  As relevant here, Dr. Sagers expressed to Dr. Panchanathan that she "didn't want to be the next Betsy Cantwell" (*i.e.*, the previous VPR of KE), meaning she "didn't want to arrive and two years

---

[1]     When Dr. Sagers was hired in July 2018, KE was known as "the Office of Knowledge Enterprise Development."  (Doc. 49-2 at 2.)  Throughout her response opposing summary judgment, Dr. Sagers refers to the organization as both "KED" (short for "Knowledge Enterprise Development") and "KE."  (*See, e.g.*, Doc. 54 at 1, 4.)  During her deposition, Dr. Sagers clarified that KED and KE are the same organization. (Doc. 49-1 at 6 [explaining that "KE . . . was then called K-E-D, KED.  And so, just for the record, the office changed names soon after I got there"].)

later be fired." (*Id.* at 8, 40-41.)[2]

On July 27, 2018, Dr. Sagers accepted a position as both the VPR of KE and a tenured professor in ASU's College of Integrative Sciences and Arts. (Doc. 49-2 at 2-3.) The VPR position was a one-year administrative appointment, "renewable contingent upon satisfactory performance and the needs of the university." (*Id.* at 2.)[3] As VPR, Dr. Sagers was responsible for helping ASU increase its funding expenditures by, among other things, "[d]evelop[ing] and execut[ing] a strategy to maximize the research productivity of faculty and academic units to ensure continued growth of the ASU research enterprise." (Doc. 49-1 at 7; Doc. 49-2 at 2.) To that end, one of Dr. Sagers's responsibilities was to help increase the number of funding proposals in an effort to achieve President Crow's goal of $815 million in research expenditures by 2025. (Doc. 49-1 at 6.)

For context, at all relevant times, KE classified research projects for which ASU receives funding into four tiers, generally organized by dollar value. (*Id.* at 36.) The parties dispute whether clear boundaries existed between tiers. (*Id.* at 19, 36-37.)[4] Dr. Sagers was recruited and hired to handle "Tier 1 and Tier 2" projects while Dr. Neil Woodbury, ASU's "chief science and technology officer," was responsible for Tiers 3 and 4. (Doc. 49-1 at 19, 34; Doc. 54-1 at 70.) However, Dr. Sagers's and Dr. Woodbury's responsibilities overlapped such that, at times, the two "would "attend[] the same meetings or participate[] in the same project teams." (Doc. 54-1 at 70. *See also id.* ["Dr. Sagers was responsible for Tier 1 and Tier 2 research projects. If those are successful, they can lend themselves to Tier 3 and Tier 4 projects. Tier 1, Tier 2, being Sagers[], Tier 3, Tier 4 being Woodbury,

---

[2]      As of June 2018, Dr. Sagers had not spoken with Dr. Cantwell about why she had been removed from the VPR position. (Doc. 49-1 at 9.) At some point after Dr. Sagers became VPR, she had a short conversation with Dr. Cantwell, who said that she had been removed from the position because she had a "difficult relationship" with Dr. Panchanathan. (*Id.*)

[3]      The administrative appointment became effective September 20, 2018. (Doc. 49-2 at 2.)

[4]      Dr. Panchanathan acknowledged that it was "very hard to draw a hard and fast line of boundaries" but provided general dollar ranges for the tiers (Doc. 49-1 at 36-37), whereas Dr. Sagers testified that "[i]t's unclear what the tiers actually meant" (*id.* at 19).

so working hand-in-glove, so to speak."].)[5]

KE's 2018 fiscal year ended on June 30, 2019.  (Doc. 49-1 at 48-49.)  The parties dispute whether Dr. Sagers's job performance was satisfactory as of June 2019 (as well as whether it could be fairly and accurately measured after less than a year on the job) but, in any event, Dr. Panchanathan renewed Dr. Sagers's VPR appointment.  (Doc. 49-1 at 46 [Q: "So Dr. Sagers was appointed effective . . . September 20th of 2018.  She then retained that role through the next fiscal year of 2019.  Correct?"  A: "Correct"].)

Also in June 2019, Stacey Esposito, a member of Dr. Sagers's staff, began experiencing "issues" working with Dr. Sagers.  (Doc. 49-3 at 20.)  Among other things, Esposito testified that Dr. Sagers would make "negative comments" about team members and, in one instance, dismissed one of Esposito's ideas as nonsensical but later shared the idea at a meeting.  (*Id.* at 20-21.)  In August 2019, Esposito felt that Dr. Sagers's negative comments had increased in frequency and went to "employee assistance" to discuss her concerns with "one of the counselors."  (*Id.* at 21.)  Between August and October 2019, Esposito attended six sessions with employee assistance.  (*Id.* at 22.)

In 2019, Elaina Harrington was the HR director for KE.  (*Id.* at 3.)  In this role, Harrington held regular one-on-one meetings with the members of Dr. Panchanathan's executive team, including Dr. Sagers.  (*Id.* at 6.)

On August 28, 2019, during one such meeting with Harrington, Dr. Sagers voiced concerns about the working environment at KE.  More specifically, Dr. Sagers reported a "culture of fear" in the office.  (Doc. 54-1 at 8.)  Dr. Sagers described the complaint as "less about [Dr. Panchanathan] and more about the climate of the office" but noted that,

---

[5]     Acknowledging this overlap, Adriana Kuiper, Dr. Panchanathan's chief of staff, testified that, in her view, it might have been helpful (at least in some instances) for Dr. Panchanathan to provide Dr. Sagers and Dr. Woodbury with clearer guidance "on roles and responsibilities for . . . specific project[s]."  (Doc. 54-1 at 69-70.)  However, Dr. Panchanathan testified that this overlap was intentional—he "never wanted Dr. Woodbury to function independently, because . . . Woodbury's role is to make sure that he interfaces with the VPR."  (Doc. 49-1 at 65.  *See also id.* ["[I]f you want to be successful in tier three and tier four, you need the muscle of tier one and tier two. . . .  I always advised [Dr. Woodbury to] . . . go to Dr. Sagers, seek her help and advice so . . . it is a collaborative effort."].)

"as the head of the office," Dr. Panchanathan was "responsible" for the "working environment." (Doc. 49-1 at 11, 13.)  During her deposition, Dr. Sagers elaborated that KE's work environment was "toxic" and asserted that "many people" in the office were "anxious," in part because it was a "demanding" job but also because there was a pattern of "abrupt dismissals" and people were "fearful they'd be fired if they didn't tow the line." (*Id.* at 13.)  Harrington provided a similar description of the meeting.  (Doc. 49-3 at 6 ["[W]e were talking about a culture of fear. . . .  [W]e were discussing . . . how it was uncomfortable and that employees seemed to be fearful."].)  Harrington also testified that "employees were fearful" because two supervisors—Dr. Panchanathan and a female colleague—would raise their voices at times.  (*Id.* at 6-7.)  However, Harrington clarified that no formal complaints were made about Dr. Panchanathan's yelling—instead, it was "[k]ind of like talk around the office, but nothing brought to [HR]."  (*Id.* at 7.)  Dr. Sagers and Harrington also discussed "what [could] be done to make [office culture] better."  (*Id.* [Harrington: "I knew we were going to have a Gallup survey coming in and Dr. Sagers was also talking about a retreat that was going to happen, so those were the two things that we touched on. . . .  Dr. Sagers had hoped that that would be a big discussion at this retreat"].)

At some point after the August 28, 2019 meeting between Harrington and Dr. Sagers, a "survey" was distributed to KE's employees.  (Doc. 49-1 at 14-15.)  The survey was meant "to get at the culture of fear."  (*Id.* at 15.)

As VPR of KE, Dr. Sagers also met with Dr. Panchanathan on a regular basis.  (Doc. 49-1 at 40 [Dr. Panchanathan, describing "weekly" or "biweekly" meetings with the members of his executive team].)  On September 4, 2019,[6] during one such meeting, Dr. Panchanathan suggested that Dr. Sagers focus on Research Experience for Undergraduate awards ("REUs"), which are small grants (*i.e.*, less than $10,000 each) attached to preexisting National Science Foundation ("NSF") grants that go through a truncated review

---

[6]     Dr. Panchanathan testified this meeting occurred "somewhere in 2019.  Earlier part of 2019."  (Doc. 49-1 at 52.)  To the extent the date is disputed, the Court takes as true Dr. Sagers's testimony that the meeting occurred on September 4, 2019.  (Doc. 49-1 at 18.)

process.  (Doc. 49-1 at 18-19, 51-52; Doc. 54-1 at 14-16.)[7]  The parties agree that it would take a substantial number of REUs to generate significant funding (Doc. 49-1 at 65) but dispute whether focusing on REUs was a viable strategy for increasing research expenditures to meet President Crow's goal.  (Doc. 49-1 at 51-52 [Dr. Panchanathan, describing the REUs as "easier targets" and "low-hanging fruit" because they operate as supplements to preexisting grants and "don't go through a process of review like all the other proposals for months"]; Doc. 54-1 at 14-15 [Dr. Sagers, asserting that in order to "move the needle at all, we would've had to get a thousand or thousands of [REUs].· And the NSF would not make those awards, so it simply was not . . . a viable strategy to increase research expenditures"].)  During the meeting, Dr. Sagers "pushed back" on the assignment by telling Dr. Panchanathan that the strategy "·wouldn't move the needle and . . . was a waste of a VPR salary."  (Doc. 54-1 at 16-17.  *See also id.* at 17 ["I just said that it wasn't worth my time to be working on $5,000 awards."].)

On October 3 and 4, 2019, KE held a senior leadership retreat.  (Doc. 57-1 at 9; Doc. 49-3 at 30-31.)[8]  Both Dr. Sagers and Dr. Panchanathan attended.  (Doc. 49-3 at 8.)  During the retreat, "[t]he culture of fear was a big topic."  (*Id.*)

On October 11, 2019, Esposito complained to both Harrington and Adriana Kuiper, Dr. Panchanathan's chief of staff, about Dr. Sagers's behavior.  (Doc. 49-3 at 9, 22-23, 37.)  The same day, Kari Buice, Dr. Sagers's administrative specialist, lodged a similar

---

[7]      Dr. Sagers described the REUs as "less than $10,000 each."  (Doc. 54-1 at 14.)  Dr. Panchanathan described them as between $8,000 and $12,000.  (Doc. 49-1 at 65.)  To the extent the average dollar amount of an REU is disputed, it is not material to the Court's analysis.

[8]      Defendants attached two exhibits to their reply brief.  (Doc. 57-1.)  Defendants explain that the exhibits—a portion of Dr. Sagers's deposition transcript and some excerpts from Dr. Sagers's journal—were submitted to rebut Dr. Sagers's allegation that Dr. Panchanathan "discriminated against her or other KE employees based on gender."  (Doc. 57 at 3 n.2.)  Given that Dr. Sagers does not object to the exhibits, and that they address arguments raised in Dr. Sagers's response brief, the Court may consider the exhibits for purposes of summary judgment.  *TSI Inc. v. Azbil BioVigilant Inc.*, 2014 WL 880408, *1 (D. Ariz. 2014) ("While a party may not file 'new' evidence with a reply, it may file 'rebuttal' evidence to contravene arguments first raised by the non-moving party in its opposition.").  In any event, the information provided by the new exhibits is not material to any of the conclusions in this order—even without it, summary judgment would be appropriate.

complaint.  (*Id.* at 9, 11-12, 29.)[9]  In broad strokes, both Esposito and Buice complained that Dr. Sagers tended to give conflicting instructions (and then criticize employees for following those instructions), would lash out verbally, and sometimes dismissed their ideas as nonsensical only to subsequently raise the same ideas as her own.  (Doc. 54-1 at 57-59; Doc. 49-3 at 9, 21-22, 31, 37.)  Esposito also complained that Dr. Sagers frequently disparaged colleagues.  (Doc. 49-3 at 20-23.)

Shortly thereafter, on October 14, 2019, Harrington and Kuiper met with Dr. Sagers to discuss the complaints.  (Doc. 49-3 at 13.)  Kuiper described Dr. Sagers's reaction as "hurt" and "surprised" and testified that she too was surprised by the allegations because her "interactions with Dr. Sagers had always been pleasant."  (Doc. 54-1 at 63, 79-80.)  Kuiper further testified that, when Dr. Panchanathan heard about the complaints, he was also surprised.  (*Id.* at 80 ["I believe that [Dr. Panchanathan] shared the same opinion as me, that his interactions with Dr. Sagers were always very pleasant."].)[10]

The same day, Dr. Panchanathan spoke with Dr. Sagers about a "360 review."  (Doc. 57-1 at 9; Doc. 49-1 at 21.)[11]  A "360 review" is "a survey [that] . . . asks your peers and people above you and on the hierarchy within an organization above you, the level that you are and below you, to get a better perspective of how people see you."  (Doc. 49-3 at 14. *See also id.* ["[I]t's just another tool that ASU has for managers to understand how they are perceived and shows them their blind spots and areas of strengths, as well."].)  In

---

[9]     According to Kuiper, Buice originally complained to her direct supervisor, who reported the complaint to Kuiper, "so it was an escalation through supervisors, essentially." (Doc. 54-1 at 61.)  However, "in the ordinary course," HR complaints went to Harrington and/or Tamara Deuser, another member of KE's HR department.  (*Id.* at 61-62.)  Buice testified that she decided to speak with HR about Dr. Sagers at Esposito's suggestion. (Doc. 49-3 at 30 ["She wanted me to talk to HR because there [were] things that were going on between . . . Dr. Sagers, [Esposito], and myself.  That she was struggling with.  We kind of both were struggling, but how I handle my struggles was a little different than how she handled hers.  She was struggling with things, and she knew that I knew there were things going on.  She knew I had issues.  So she said it was probably best if I talked to HR."].)

[10]     It is not clear when Dr. Panchanathan was alerted to Esposito's and Buice's complaints about Dr. Sagers.  Dr. Sagers testified that, on October 28, 2019, she became aware that Kuiper and/or Harrington had spoken with Dr. Panchanathan about the complaints.  (Doc. 49-1 at 12.)

[11]     Harrington testified that during the October 14, 2019 meeting with Dr. Sagers, Kuiper also suggested that Dr. Sagers complete a "360 review."  (Doc. 54-1 at 124.)

response, Dr. Sagers informed him that she "had just done one" a few months earlier. (Doc. 49-1 at 21.) During her deposition, Dr. Sagers explained that her response was meant to suggest that "sending out . . . a second 360 within six months' time would send a red flag to everyone [she] was trying to work with." (*Id. See also id.* ["I assumed he would appreciate that. He knows . . . that it was a punitive 360."].)[12]

On October 22, 2019, Harrington, Kuiper, and Dr. Sagers met with Esposito and then with Buice. (Doc. 49-1 at 11; Doc. 49-3 at 13-14.) Esposito had previously expressed to Harrington that she no longer wanted to work with Dr. Sagers, while Buice had stated that she was willing to continue working with Dr. Sagers if Dr. Sagers could "actually change." (Doc. 49-3 at 11-12.) The meeting with Esposito was short and "awkward" and Esposito was subsequently reassigned. (*Id.* at 11, 23-24.) The meeting with Buice was "uncomfortable" but productive. (*Id.* at 14.)

Thereafter, Kuiper started meeting regularly with Dr. Sagers and Harrington, together, to focus on personnel matters. (Doc. 54-1 at 63, 65.)[13] Based on those meetings, Kuiper got the sense that Dr. Sagers "was trying to make progress on those interpersonal issues." (*Id.* at 65.)

In November 2019, still frustrated with Dr. Sagers's performance, Dr. Panchanathan "beg[an] talking to [Dr. Sagers] about his dissatisfaction." (Doc. 49-1 at 18.) During his deposition, Dr. Panchanathan testified that he was specifically dissatisfied with "[t]he efforts that were being taken, particularly with meeting with faculty, deans, and the feedback that [he] was getting," as well as "the [dollar] volume of proposals that were going out" and "the number of [principal investigators ('PIs')] being involved in the projects." (*Id.* at 46. *See also id.* at 70 ["[C]learly we are trending the wrong direction.

---

[12] Dr. Sagers described herself as "blindsided" by Esposito's and Buice's complaints and "pleased by the outcome of [her] 360, adding further confusion." (Doc. 54-1 at 20.) Viewed in the light most favorable to Dr. Sagers, this testimony suggests that she completed a second 360 review following Esposito's and Buice's complaints and, at least in her view, the results were positive.

[13] Previously, Kuiper had regular one-on-one meetings with Dr. Sagers to "follow[] up on assignments or tasks that Dr. Panchanathan would have given to [Dr. Sagers] to understand the status, where things stood, what issues may have arisen." (Doc. 49-3 at 39.)

And the month over month data from [those] years is very, very illustrative and also very disturbing. . . .   We need to [sic] better in tier l and tier 2 because that's where the bread and butter is in terms of making sure that you get more of these done."].)  However, the specific topics discussed during the November 2019 meeting are not clear from the record.

At some point in November or December 2019, an outside consultant named Dr. David Colarossi was hired to evaluate KE's culture.  (Doc. 49-3 at 8; Doc. 54-1 at 41.)  Dr. Colarossi reviewed KE's charter, held one-on-one interviews with key personnel (including Dr. Sagers, Dr. Panchanathan, Harrington, and Kuiper), and aggregated and analyzed the "collected data."  (Doc. 54-1 at 43.)  Dr. Colarossi also produced a "Culture Evaluation" presentation, which described his findings.  (*Id.* at 37-54.)  As for KE's culture, the presentation notes the breadth of KE's work, that Dr. Panchanathan is "a highly innovative and change-oriented leader," and that "[t]here is expectation that team members are able to shoulder a large work load without a great deal of managerial oversight."  (*Id.* at 45-48.)  The presentation also provides: "Given the pace of work, team members do not have a great deal of free time for casual relationship development.  In the same way, there is less of an opportunity for emotional processing and rehashing of conflict.  Productivity and performance are the priorities. . . .  High-performing team members show interpersonal savvy but are unlikely to demonstrate a great deal of sensitivity.  Compared to other companies, there is less emphasis on empathy, interpersonal tact and caution."  (*Id.* at 49.)  As for "opportunities for development," the presentation identifies two issues: (1) "a lack of clarity around expectations"; and (2) "a culture of fear growing among lower level employees." (*Id.* at 51-53.)

On January 2, 2020, Dr. Panchanathan informed Dr. Sagers that her administrative appointment as VPR of KE would not be renewed and that, effective January 30, 2020, her appointment would "change" to "Vice President of Knowledge Enterprise Development (KED) Campus Director at the Polytechnic Campus" for six months, at which point she would return to full-time faculty status.  (Doc. 49-1 at 23.  *See also id.* at 56 [explaining that Dr. Sagers "still carried the title of the VPR for six more months" but her "assignment

of duties" changed to "the Polytechnic campus"].)[14]   The parties dispute what Dr. Panchanathan said during this meeting about why Dr. Sagers's appointment was not being renewed.   (*Id.* at 55-56 [Dr. Panchanathan, testifying that the meeting was "about performance and the fact that we were not achieving what we were achieving" and that although "[t]he personnel issues contributed" to his decision, he did not tell Dr. Sagers that fact]; Doc. 54-1 at 20 [Dr. Sagers, testifying that Dr. Panchanathan provided two reasons for the nonrenewal: "the HR issue and downturn in proposals"].)[15]

After Dr. Sagers transitioned to her new role, Dr. Woodbury took over her responsibilities on an interim basis (and retained his own duties as well).  (Doc. 49-3 at 38.)

In early July 2020, Dr. Panchanathan began a leave of absence from ASU to serve as the director of NSF.  (Doc. 49-1 at 69.)  Dr. Woodbury served as interim EVP until February 2021, when Dr. Sally Morton was hired as "a permanent EVP."  (Doc. 49-3 at 38.)[16]

In the fall of 2021, Matt Hulver was hired as VPR of KE.  (*Id.*)

II.   Procedural History

On February 17, 2021, Dr. Sagers initiated this action.  (Doc. 1.)

On July 2, 2021, Dr. Sagers filed her operative pleading, the First Amended Complaint ("FAC").  (Doc. 16.)  The FAC asserts four causes of action: (1) a claim under 42 U.S.C. § 1983 against Dr. Panchanathan in his individual capacity, premised on the allegation that Dr. Panchanathan violated Dr. Sagers's First and Fourteenth Amendment rights; (2) a state-law claim against Dr. Panchanathan under A.R.S. § 38-532, an Arizona whistleblowing statute; (3) a Title VII gender discrimination claim against both Dr.

---

[14]   Ultimately, Dr. Sagers' administrative appointment (and thus, her administrative salary) was extended several times until November 27, 2020.  (Doc. 49-1 at 24-25.)

[15]   The portion of Dr. Sagers's deposition lodged at page 20 of Doc. 54-1 does not indicate whether counsel or Dr. Sagers provided this description of the January 2, 2020 meeting, although context suggests the speaker was reading a written summary of the meeting.

[16]   As of August 2022, Dr. Woodbury was again serving as the chief science and technology officer.  (Doc. 49-3 at 38.)

1  Panchanathan and ABOR; and (4) a Title IX gender discrimination claim against both Dr.

2  Panchanathan and ABOR.  (*Id.*)

3      On July 16, 2021, Defendants moved to dismiss Count Two in its entirety and

4  Counts Three and Four as they pertain to Dr. Panchanathan.  (Doc. 17.)  After a full briefing

5  (Docs. 18, 19), the Court granted Defendants' motion.  (Doc. 20.)  Thus, "Dr. Sagers's only

6  remaining claims are (1) a § 1983 claim in Count One against Dr. Panchanathan; (2) a Title

7  VII claim in Count Three against ABOR; and (3) a Title IX claim in Count Four against

8  ABOR."  (*Id.* at 10.)

9      On November 7, 2022, Defendants filed the pending amended motion for summary

10  judgment as to Dr. Sagers's remaining three claims.  (Doc. 49.)  The motion is now fully

11  briefed.  (Docs. 54, 57.)  Neither side requested oral argument.

12                              **DISCUSSION**

13  I.   <u>Legal Standard</u>

14      "The court shall grant summary judgment if [a] movant shows that there is no

15  genuine dispute as to any material fact and the movant is entitled to judgment as a matter

16  of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

17  the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

18  in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

19  1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable

20  to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."

21  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is

22  improper where divergent ultimate inferences may reasonably be drawn from the

23  undisputed facts."  *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

24      A party moving for summary judgment "bears the initial responsibility of informing

25  the district court of the basis for its motion, and identifying those portions of 'the pleadings,

26  depositions, answers to interrogatories, and admissions on file, together with the affidavits,

27  if any,' which it believes demonstrate the absence of a genuine issue of material fact."

28  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of

production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). At the same time, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.    <u>Retaliation Claims</u>

In each of her three remaining claims (§ 1983, Title VII, Title IX), Dr. Sagers alleges both retaliation and disparate treatment based on gender. The Court begins by discussing the retaliation component of each claim, while acknowledging that each claim is ultimately governed by distinct legal standards.

In broad strokes, Dr. Sagers's retaliation theory is that she reported "Dr. Panchanathan's discriminatory and illegal conduct towards female members of the KE" to HR and, in retaliation, was removed from her position as VPR of KE. (Doc. 54 at 2.)

…

…

A.   **First Amendment Retaliation**

"To establish a prima facie First Amendment retaliation claim, the plaintiff must prove that (1) he engaged in protected speech; (2) the defendants took an 'adverse employment action' against him; and (3) his speech was a 'substantial or motivating' factor for the adverse employment action." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022) (cleaned up). "If the plaintiff establishes a prima facie case, the burdens of evidence and persuasion shift to the Defendants to show that the balance of interests justified their adverse employment decision." *Id.* (cleaned up). "That is, a defendant can avoid liability for retaliation by showing that it had a legitimate administrative interest in suppressing the speech that outweighed the plaintiff's First Amendment rights." *Id.* at 776-77 (citation omitted).

In their motion, Defendants challenge the first and third elements of Dr. Sagers's prima facie case—*i.e.*, whether she engaged in protected speech and whether her speech was a substantial or motivating factor in Dr. Panchanathan's decision to remove her as VPR—and argue that, in any event, Dr. Panchanathan is entitled to qualified immunity. (Doc. 49 at 8-12.)

1.   Protected Speech

Dr. Sagers contends that Dr. Panchanathan "retaliated against her for reporting to KE HR Department Director, Elaina Harrington, about his gender discrimination against her and others in the department, his fostering of a culture of fear, and creating a hostile work environment through his bullying tactics." (Doc. 54 at 10.)[17] "Whether a public employee . . . has engaged in speech protected by the First Amendment breaks down to two inquiries: (1) whether [she] spoke on a matter of public concern, and (2) whether [she] spoke as a private citizen or public employee." *Dodge*, 56 F.4th at 777 (internal quotation

---

[17]      Dr. Sagers asserts that she was "demote[d]" (Doc. 54 at 2) while Defendants assert she was "reassigned" (Doc. 49 at 1).  The distinction is not material to any of the parties' summary judgment arguments because Defendants do not dispute that removing Dr. Sagers from the VPR position (and not renewing her administrative appointment) was an adverse employment action for purposes of her retaliation claims.  (*See generally* Doc. 49.)  At any rate, for ease of reference and viewing the facts in the light most favorable to Dr. Sagers, the Court accepts that Dr. Sagers was "demoted."

marks and citation omitted).   Defendants contend that Dr. Sagers's claim fails both inquiries.  (Doc. 49 at 9-11.)

a.   **Matter Of Public Concern**

"Public employees' expression is on a matter of public concern if it relates to any matter of political, social, or other concern to the community, and not upon matters *only* of personal interest." *Ballou v. McElvain*, 29 F.4th 413, 429 (9th Cir. 2022) (cleaned up).  *See also Anthoine v. N. Cent. Ctys. Consortium*, 605 F.3d 740, 748 (9th Cir. 2010) ("'Public concern' does not have a precise definition, but 'the essential question is whether the speech addressed matters of 'public' as opposed to 'personal' interest.'") (citation omitted).

Here, the allegation underlying Dr. Sagers's First Amendment-based § 1983 claim is that she reported Dr. Panchanathan's "illegal, improper, and discriminatory conduct" to HR. (Doc. 16 ¶ 51.)  In their motion for summary judgment, Defendants contend that "[t]he evidence contradicts these allegations" because Dr. Sagers' August 28, 2019 conversation with Harrington focused on the "climate of the office," which "is not a matter of public concern." (Doc. 49 at 8-10, citation omitted.)  In response, Dr. Sagers accuses Defendants of mischaracterizing her claim as arising "only [from] one meeting between Elaina Harrington and Dr. Sagers on August 28, 2019" because her "complaints, and particularly those relating to Dr. Panchanathan's gender discrimination in the department spanned over several meetings, and not just with Ms. Harrington, but with Dr. Panchanathan's Chief of Staff, Adriana Kuiper as well." (Doc. 54 at 10-11.)  According to Dr. Sagers, both Harrington and Kuiper "testified that during their meetings with Dr. Sagers, they both recall discussing the 'culture of fear' and . . . her concern that following past precedent with other female executives in the office, Dr. Panchanathan's adverse treatment of her was motivated by her gender." (*Id.* at 11.)  Therefore, Dr. Sagers contends that "the seminal issue is gender discrimination," which is a matter of public concern, and "not the KE office climate." (*Id.* at 11-12.)  In reply, Defendants argue that Kuiper's and Harrington's testimony "do[es] not show that Sagers ever complained that [Dr. Panchanathan] engaged in gender-based discrimination against her or any other KE employee.  Rather, they show

1   that Kuiper and Harrington investigated and attempted to address allegations that *Sagers*

2   mistreated two of her subordinates (Stacy Esposito and Kari Buice)."  (Doc. 57 at 2.)

3          As a threshold matter, the parties' briefing raises two distinct factual issues: (1) the

4   substance of Dr. Sagers's statements during her meeting with Harrington on August 28,

5   2019; and (2) whether Dr. Sagers complained about gender discrimination to Harrington

6   and Kuiper at any other relevant time.  As for the former, it is not clear that Dr. Sagers

7   disputes Defendants' contention that the August 28, 2019 meeting only concerned the

8   "office climate" and did not involve any allegations of gender discrimination—indeed, Dr.

9   Sagers herself describes that meeting as addressing "general matters pertaining to the office

10  culture" and faults Defendants for focusing too narrowly on it (Doc. 54 at 10-11)—and the

11  record supports Defendants' position at any rate.  There is no evidence from which a

12  reasonable factfinder could conclude that gender discrimination was discussed during the

13  August 28, 2019 meeting.  Dr. Sagers and Harrington both testified that Dr. Sagers's

14  complaint during that meeting was about a "culture of fear" in the department.  (Doc. 54-

15  1 at 8-10, 119; Doc. 49-3 at 6-7.)  There is no testimony that gender discrimination was an

16  aspect of the alleged "culture of fear."  (*See also* Doc. 49-1 at 11 [Dr. Sagers, testifying

17  that "[t]he discussion . . . was less about [Dr. Panchanathan] and more about the climate

18  of the office"]; Doc. 49-3 at 6-7 [Harrington, testifying that employees were fearful because

19  both Dr. Panchanathan and a female colleague would raise their voices at times].)  When

20  asked, Harrington avowed that she did not remember Dr. Sagers bringing up gender

21  discrimination during the meeting.  (Doc. 49-3 at 8.)  Thus, even viewed in the light most

22  favorable to Dr. Sagers, the evidence does not give rise to an inference that Dr. Sagers

23  complained about gender discrimination to Harrington on August 28, 2019.[18]  Accordingly,

24  the content of Dr. Sagers's speech during the August 28, 2019 meeting is not genuinely

25  _____

26  [18]       This conclusion is further supported by the consultant's resulting culture evaluation
    (which, according to Dr. Sagers, stemmed from her complaints on August 28, 2019).  The
27  consultant's presentation, which is focused on office culture, does not include any
    information suggesting that gender discrimination was an aspect of KE's allegedly
28  problematic culture.  (Doc. 54-1 at 37-54.)  Instead, the slide describing concerns about a
    culture of fear notes potential causes such as "overly directive feedback," "emotional
    outbursts" by leaders, and inconsistent positive feedback.  (*Id.* at 53.)

disputed—it only involved the office culture and climate.[19]

In contrast, a reasonable juror could find that Dr. Sagers complained about gender discrimination during a later meeting with Harrington and Kuiper.  Specifically, Dr. Sagers cites the following portion of Kuiper's deposition testimony:

> [Counsel:]   And at the very bottom paragraph of that same page, the sentence that says, *Since we last spoke, Kuiper remembered that in the meeting between Kuiper, Harrington and Sagers about Sagers' behavior, Sagers specifically asked if gender had anything to do with what was happening.*  Do you see that?
>
> [Kuiper:]      Yes.
>
> [Counsel:]      Do you remember having that conversation?
>
> [Kuiper:]      I do.
>
> [Counsel:]   And so there, again, there's Cindy Sagers is raising gender discrimination as a possible motive for what was happening to her in the Department.
>
> [Kuiper:]      My recollection is that she asked me if this was being motivated due to her gender and that I said it [was] not.
>
> [Counsel:]      Okay.  But you remember having that conversation where she raised that as a potential concern?
>
> [Kuiper:]      I do.

(Doc. 54-1 at 76-77.)

Although Kuiper's testimony does not pinpoint the exact date of this "meeting between Kuiper, Harrington and Sagers about Sagers' behavior," there is evidence that Dr. Sagers met with Kuiper and Harrington on October 14, 2019 to discuss Esposito's and Buice's complaints.  (Doc. 49-3 at 13.)  Thereafter, Kuiper and Harrington regularly met

---

[19]      Dr. Sagers attempts to connect Dr. Panchanathan's allegedly problematic behavior to gender by asserting that he "mistreat[ed] . . . his employees who were mostly women." (Doc. 54 at 6.)  On its own, the fact that KE employed a substantial number of women doesn't support an inference that its "culture of fear" was related to gender.  Also, to the extent Dr. Sagers believed the office culture was the result of gender bias, there is no evidence that she expressed this view to Harrington on August 28, 2019.  *See also Desrochers v. City of San Bernardino*, 572 F.3d 703, 711 (9th Cir. 2009) ("[T]he plain language of the grievances differs from the sergeants' post hoc characterizations.  We look to what the employees actually said, not what they say they said after the fact."); *Hernandez v. City of Phx.*, 432 F. Supp. 3d 1049, 1060 (D. Ariz. 2020) ("Plaintiff Hernandez casts his posts as being about issues of assimilation, federal spending and media coverage. However, the Court is not required to accept Plaintiff's characterization of his posts.").

with Dr. Sagers to discuss personnel issues.  (Doc. 54-1 at 63.)  Thus, viewing the record in the light most favorable to Dr. Sagers, a reasonable factfinder could infer that, sometime between October 14, 2019[20] and January 2, 2020 (when Dr. Sagers learned that her VPR appointment would not be renewed), Dr. Sagers raised concerns about gender discrimination to Harrington and Kuiper.[21]

Kuiper's testimony does not shed light on the precise substance of Dr. Sagers's statement about gender discrimination.  (*See, e.g.*, Doc. 54-1 at 76, emphasis added ["Sagers is raising gender discrimination as a possible motive for *what was happening to her in the Department*"]; *id.*, emphasis added ["she asked me if *this* was being motivated due to her gender"].)  However, there is evidence that, during the relevant period (*i.e.*, mid-October 2019 to early January 2020), Dr. Sagers was dealing with the fallout from Esposito's and Buice's complaints about her; had been given the REUs assignment, which she felt was below her pay grade and/or not worthwhile (Doc. 54-1 at 14-17); and was

---

[20]    Although it is possible that Harrington, Kuiper, and Dr. Sagers met before October 14, 2019 to discuss "Sagers' behavior," Dr. Sagers does not cite any portion of the record discussing any such meetings.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

[21]    Although Dr. Sagers asserts that she made complaints about gender discrimination "spann[ing] over several meetings" (Doc. 54 at 10-11, 15), the materials that Dr. Sagers cites in purported support of this assertion are—with the exception of the passage from Kuiper's deposition testimony that is reproduced in the text above—inapposite.  (*See, e.g.*, Doc. 54-1 at 58-60 [describing Esposito's and Buice's complaints about Dr. Sagers]; *id.* at 63 [same]; *id.* at 64-65 [describing Dr. Sagers's desire to know the complainants' identities]; *id.* at 65 [stating that Kuiper met weekly with Harrington and Dr. Sagers to discuss "interpersonal issues" following Esposito's and Buice's complaints]; *id.* at 71 [Q: "So aside from that instance of Dr. Sagers' reporting difficulties and working with Dr. Panchanathan and referencing Cantwell, were there any others, to your knowledge, that mentioned they had difficulties with working with Dr. Panchanathan?"  A: "I think it was a shared understanding that there were incredibly high expectations"]; *id.* at 72-73 [describing Kuiper's role in a separate "internal ASU investigation" during which an HR representative asked Kuiper if she "had witnessed others being a target of gender discrimination by Dr. Panchanathan specifically," to which she responded "no"]; *id.* at 73-74 [describing a conversation between Kuiper and Dr. Panchanathan that gave Kuiper the impression that another "investigation[] into Dr. Panchanathan's conduct involving gender discrimination" might have occurred] *id.* at 116-19 [describing the August 28, 2019 meeting].)  Additionally, to the extent Dr. Sagers seeks to rely on deposition testimony in which she described conversations with co-workers Choi and Pepin, that reliance is misplaced for similar reasons—although Pepin expressed fear about being fired because she "wasn't being productive enough to satisfy [Dr.] Panchanathan" (Doc. 49-1 at 14), Dr. Sagers did not describe any conversations with Choi and/or Pepin about gender discrimination.

1    concerned about termination (Doc. 57-1 at 12 [journal entries]).  Thus, viewing the record

2    in the light most favorable to Dr. Sagers, a reasonable factfinder could conclude that "what

3    was happening to her" was a reference to one or more of these events.

4         Turning to the merits, "[w]hether speech is on a matter of public concern is a

5    question of law."  *Greisen v. Hanken*, 925 F.3d 1097, 1109 (9th Cir. 2019).  This

6    determination turns on "the content, form, and context of the expression, with content

7    weighing as the greatest single factor in the analysis."  *Ballou*, 29 F.4th at 429 (internal

8    citation and quotation marks omitted).  The content analysis focuses on "whether the public

9    or community is likely to be truly interested in the particular expression, or whether it is

10   more properly viewed as essentially a private grievance."  *Roe v. City & Cty. of S.F.*, 109

11   F.3d 578, 585 (9th Cir. 1997).  "In other words, the content of the communication must be

12   of broader societal concern."  *Id.*  "Speech that concerns issues about which information is

13   needed or appropriate to enable the members of society to make informed decisions about

14   the operation of their government merits the highest degree of first amendment protection."

15   *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (cleaned up).

16        As for Dr. Sagers's speech during her August 28, 2019 meeting with Harrington,

17   office culture is not a matter of public concern.  "[S]peech that deals with individual

18   personnel disputes and grievances and that would be of no relevance to the public's

19   evaluation of the performance of governmental agencies is generally not of public concern.

20   The same is true of speech that relates to internal power struggles within the workplace,

21   and speech which is of no interest beyond the employee's bureaucratic niche."  *Desrochers*

22   *v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009) (cleaned up).  Dr. Sagers

23   contends that her complaints about KE's culture involve matters of public concern because

24   they "relate to Defendants['] mismanagement of the department."  (Doc. 54 at 12.)

25   However, even assuming that "Dr. Panchanathan's conduct and mistreatment of KE staff

26   members" (*id.* at 11) resulted in a "culture of fear" that, in turn, interfered with the

27   university's ability to function (which is not supported by the record), "the reality that poor

28   interpersonal relationships amongst coworkers might hamper the work of a government

- 18 -

office does not automatically transform speech on such issues into speech on a matter of public concern." *Desrochers*, 572 F.3d at 711.  *See also id.* at 713 ("[W]hen working for the government, saying one's boss is a bully does not necessarily a constitutional case make."); *Vicente v. City of Prescott*, 2014 WL 3939277, *4-5 (D. Ariz. 2014) ("Grievances about vulgarity by a supervisor, although clearly legitimate personnel matters, generally do not implicate public concerns. . . .  Although Plaintiffs argue that it was 'common sentiment' that Devendorf had trouble interacting appropriately with co-workers, they present no evidence that this trouble amounted to a public controversy . . . .").

The form and context of Dr. Sagers's August 28, 2019 statement to Harrington also weigh against characterizing it as protected speech.  "In reviewing form and context, [courts] focus on the point of the speech, looking to such factors as the employee's motivation and the audience chosen for the speech."  *Greisen*, 925 F.3d at 1109 (internal quotation marks and citation omitted).  As Defendants note, on August 28, 2019, Dr. Sagers "discussed the KE working environment in 'a regularly scheduled one-on-one' with a KE HR representative."  (Doc. 49 at 10, citation omitted.)  The form of Dr. Sagers's statement is thus a further reason to conclude that it did not involve matters of public concern.  *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1104 (9th Cir. 2011) ("[W]hen speech takes the form of an internal employee grievance, and is not presented to the public, the form 'cuts against a finding of public concern.'") (citation omitted); *Desrochers*, 572 F.3d at 714 ("[A] limited audience weighs against a claim of protected speech.") (cleaned up).[22]

As for context, "[t]he question of whether the speech was made to further some purely private interest is relevant to that inquiry, as is a determination of whether the speech

---

[22]     With that said, the fact that Dr. Sagers raised her concerns about office culture to an HR representative makes her speech somewhat more likely to rise to a matter of public concern than, say, a "remark made to a co-worker."  *Reel v. City of El Centro*, 2023 WL 1822840, *13 (S.D. Cal. 2023).  *See also Anthoine*, 605 F.3d at 749 ("It is not determinative that Anthoine did not air his concerns publicly. . . .  Anthoine expressed his concerns about Newton's misrepresentation directly to Freeman, the chairman of the board, because he believed (correctly) that Freeman would be able to address and correct the problem."); *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004) ("By expressing her disapproval of the allegedly retaliatory treatment of Perry to those responsible for deciding whom to promote to the vacant position, Thomas aired her views in an effective forum.").

was made in the context of a workplace power struggle." *Desrochers*, 572 F.3d at 715 (internal quotation marks and citations omitted).  On the one hand, viewed in the light most favorable to Dr. Sagers, the evidence could support an inference that her motivations for speaking about the "culture of fear" were more altruistic than a mere "internal power struggle or personal employment grievance." *Clairmont*, 632 F.3d at 1104.  For example, it appears that Dr. Sagers was hoping to address the culture problem by raising it as an issue at the KE retreat.  (Doc. 49-3 at 7.)  Also, she testified that the "culture of fear" affected a number of her coworkers.  (*See, e.g.*, Doc. 49-1 at 13-14.)  On the other hand, it is not clear that Dr. Sagers's speech was intended to illuminate "potential or actual discrimination, corruption, or other wrongful conduct by government agencies or officials." *Clairmont*, 632 F.3d at 1104.  (citation omitted).  Instead, consistent with the speech's content, the evidence suggests that Dr. Sagers raised concerns about KE's culture in the hope of promoting a more positive work environment.  (*See, e.g.*, Doc. 54-1 at 10 ["[U]p until that point, there had been no discussion about a culture of fear or a toxic environment.  You know, everyone had their concerns, but there was no action by the administration of the office, the leadership in the office, to address this concern."].)

In sum, having considered the content, form, and context of Dr. Sagers's August 28, 2019 statement to Harrington and resolved all material disputes of fact concerning that statement in Dr. Sagers's favor, the Court concludes that the statement did not involve a matter of public concern.  Thus, to the extent Dr. Sagers's First Amendment retaliation claim arises from the August 28, 2019 meeting, Defendants' request for summary judgment is granted.

Dr. Sagers's stated concern about possible gender discrimination, which she made to Harrington and Kuiper sometime between October 14, 2019 and January 2, 2020, is a different matter.  In *Ballou*, in the context of a public employee's complaint that she was subjected to gender discrimination, the Ninth Circuit explained that "speech by public employees about unlawful discrimination in the workplace is inherently speech on a matter of public concern." 29 F.4th at 419-20, 430.  *See also id.* at 429 ("Some subjects *both*

affect a public employee's personal interests *and* implicate matters of public concern.  [We have] held that unlawful discrimination is such a matter, recognizing that 'the public has an interest in unlawful discrimination' in City government, and that employee speech about such discrimination therefore involves matters of public concern even if it arises out of a personal dispute."); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 926-27 (9th Cir. 2004) ("Disputes over racial, religious, or other such discrimination by public officials are not simply individual personnel matters.  They involve the type of governmental conduct that affects the societal interest as a whole—conduct in which the public has a deep and abiding interest."); *Rendish v. City of Tacoma*, 123 F.3d 1216, 1224 (9th Cir. 1997) ("[T]he public has an interest in unlawful discrimination by the City. . . .  [T]he unequal treatment of some persons as compared with others by the City's judicial system is an issue of public concern.").    Thus, the content of Dr. Sagers's statement about potential gender discrimination weighs in favor of finding public concern.

Turning to context and form, viewing the record in the light most favorable to Dr. Sagers, a reasonable factfinder could conclude that she raised concerns about gender discrimination to Harrington (an HR representative) and Kuiper (Dr. Panchanathan's chief of staff) during a private meeting sometime between October 14, 2019 and January 20, 2020.  Thus, like the August 28, 2019 meeting, the form of Dr. Sagers's statement suggests (albeit while not being dispositive on the matter) that her speech did not involve matters of public concern.  As for context, Dr. Sagers's motivation is unclear.  On the one hand, there is evidence that she was generally concerned about gender discrimination in the workplace. (*See, e.g.*, Doc. 49-3 at 23 [Esposito, testifying that "[Dr. Sagers] would bring up a lot that when things weren't going well it was because of gender discrimination against her. . . . [I]t was typically about [Dr. Panchanathan], but[] there was, I'd say, half and half.  There were things about [Dr. Panchanathan] and then there were just things in general about the patriarchy that we worked in. . . .  Those are [Dr. Sagers's] words.  So she wanted to smash the patriarchy.  That came up quite often."].)  On the other hand, the specific statement (*i.e.*, asking whether "what was happening to *her*" was motivated by gender bias) suggests

the statement was motivated by personal concerns.  Additionally, there is evidence that Dr. Sagers was dissatisfied with her employment situation.  (*See, e.g.*, Doc. 49-1 at 21 [ "I think that I was frustrated with the [VPR] position for a long time."].)

Nevertheless, the form and context of Dr. Sagers's statement about gender discrimination do not ultimately change the public-concern calculus.  Although the form of her speech is distinguishable from the protected speech in *Alpha Energy* (testimony supporting a coworker's grievance hearing and lawsuit), *Ballou* (internal grievances and a lawsuit), and *Rendish* (a lawsuit), the distinction is not dispositive—"[b]ecause content is the most important factor, [the Ninth Circuit] ha[s] concluded that speech about a matter of public concern may be protected even when made in a private context."  *Thomas*, 379 F.3d at 810.  *See also Chateaubriand v. Gaspard*, 97 F.3d 1218, 1223 (9th Cir. 1996) ("Chateaubriand's complaints regarding illegal campaign activity fall squarely within the category of content inherently of public concern. . . .  The form of the speech—complaints to staff and superiors rather than to the general public—does not remove it from the realm of public concern.").  Likewise, even if Dr. Sagers raised concerns about gender discrimination to further a private interest, the Ninth Circuit has instructed that "motive should not be used as a litmus test for public concern."  *Alpha Energy Savers*, 381 F.3d at 925 (citation omitted).  *See also Voigt v. Savell*, 70 F.3d 1552, 1560 (9th Cir. 1995) ("Voigt's comments consisted primarily of criticism regarding the way Judge Savell handled two internal personnel matters.  Such information carries little public import in that it does not seek to inform the public of Judge Savell's failure to discharge his duties as a judicial officer. . . .  We cannot say, however, that Voigt's speech is of absolutely no relevance to the public's evaluation of the performance of the court system.  The public has an interest in knowing whether the court treats its job applicants fairly. . . .  Because Voigt's speech referred to unfair discrimination . . . it can be characterized as touching on a matter of public concern.  Thus, though we find that Voigt's speech primarily involved his personal disputes with Judge Savell, we cannot say that it was utterly devoid of public concern.").

Accordingly, when all material disputes of fact are resolved in her favor, Dr. Sagers's statement about gender discrimination during her meeting with Harrington and Kuiper involved a matter of public concern.

### b.   **Private Citizen**

Under the second inquiry in the protected speech analysis, "the plaintiff . . . bears the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee." *Greisen*, 925 F.3d at 1111 (internal quotation marks and citation omitted). "A public employee's speech is not protected by the First Amendment when it is made pursuant to the employee's official job responsibilities. Conversely, a public employee's speech on a matter of public concern is protected if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Hagen v. City of Eugene*, 736 F.3d 1251, 1257 (9th Cir. 2013) (cleaned up). Courts "look to three non-exhaustive factors to make this assessment: (1) whether the employee confined his communications to his chain of command; (2) whether the subject matter of the communication fell within the plaintiff's regular job duties; and (3) whether the employee spoke in direct contravention to his supervisor's order." *Greisen*, 925 F.3d at 1111 (cleaned up). Although "[t]he scope and content of a plaintiff's official duties are questions of fact," the Court must "independently . . . evaluate the ultimate constitutional significance of the facts as found." *Id.* (citation omitted). *See also Dahlia v. Rodriguez*, 735 F.3d 1060, 1069 (9th Cir. 2013) ("various easy heuristics," such as whether the speech was expressed publicly, "are insufficient for determining whether an employee spoke pursuant to his professional duties").

Here, because Dr. Sagers's statement on August 28, 2019 did not involve a matter of public concern, it is unnecessary to determine whether raising concerns about KE's office climate fell within Dr. Sagers' job duties. As for her separately stated concerns about gender discrimination, Dr. Sagers contends that "[n]othing in [her] job responsibilities involves the reporting of gender discrimination. She was hired as VPR to work on coordinating with ASU faculty and others in preparing research proposals to meet President

Crow's goal of achieving $815 million in research expenditures by 2025." (Doc. 54 at 13.) To support that assertion, Dr. Sagers points to the offer letter she received for the VPR position, which lists the "key responsibilities" of the position (none of which relate to reporting gender discrimination). (Doc. 49-2 at 2.) In reply, Defendants reiterate their (inaccurate) factual contention that Dr. Sagers never complained about gender discrimination but do not address whether, assuming she made such a complaint, she was speaking as a private citizen. (Doc. 57 at 1-4.)

"Because the plaintiff bears the burden of proof at trial on this factor, a defendant moving for summary judgment must either produce evidence establishing that the plaintiff spoke as a public employee or show, through argument, that the plaintiff does not have enough evidence to establish that she spoke as a private citizen." *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1261 (9th Cir. 2016). Here, Defendants have done neither. In any event, Dr. Sagers has established a genuine issue of material fact about whether she was acting as a private citizen when she raised concerns about gender discrimination to Harrington and Kuiper. Although Dr. Sagers did not speak in direct contravention of a supervisor's order and addressed a limited audience, the "key responsibilities" listed in her offer letter could support a finding that reporting gender discrimination was not within her job duties. Accordingly, summary judgment is not warranted on this ground.

### 2. Substantial Or Motivating Factor

To establish a First Amendment retaliation claim, Dr. Sagers must also prove that her "protected speech motivated any adverse employment action taken against [her]." *Dodge*, 56 F.4th at 781. This "third step is purely a question of fact." *Anthoine*, 605 F.3d at 750 (citation omitted). "As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence." *Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002). "Where it is shown that the employer knew of the speech, . . . circumstantial evidence showing motive may fall into three, nonexclusive categories: (1) proximity in time between the protected speech and the alleged retaliation; (2) the employer's expressed opposition to the speech; and (3) other

1   evidence that the reasons proffered by the employer for the adverse employment action

2   were false and pretextual." *Id.* at 980 (internal quotation marks and citation omitted).

3       Although many of Defendants' causation-related arguments address whether Dr.

4   Panchanathan was aware of Dr. Sagers's "culture of fear" discussion with Harrington on

5   August 28, 2019 (Doc. 49 at 11), that issue is moot in light of the Court's determination

6   that the August 28, 2019 statement does not qualify as First Amendment protected speech.

7   As for the other statement by Dr. Sagers that may qualify as First Amendment protected

8   speech—her statement about gender discrimination to Harrington and Kuiper on an

9   unspecified date sometime between October 14, 2019 and January 2, 2020—Defendants

10  do not specifically address it in the portion of their motion addressing Dr. Sagers's § 1983

11  claim but do raise the general argument that Dr. Sagers "cannot establish that her speech

12  was a substantial or motivating factor for any adverse employment action that [Dr.

13  Panchanathan] may have taken against her." (Doc. 49 at 11.)  Additionally, later in their

14  motion (albeit in relation to Dr. Sagers's Title VII and Title IX claims), Defendants contend

15  that "even if Sagers had complained of gender discrimination, she could not establish that

16  her complaint caused [Dr. Panchanathan] to terminate her VPR appointment because there

17  is no evidence that he knew of her complaint beforehand." (*Id.* at 13.)  Accordingly,

18  Defendants have done enough, as the summary judgment movants under *Celotex*, to require

19  Dr. Sagers to come forward with evidence from which a reasonable juror could find a

20  causal link between her statement about gender discrimination and the adverse employment

21  action she later suffered.  "Where the non-moving party bears the burden of proof at trial,

22  the moving party need only prove that there is an absence of evidence to support the non-

23  moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

24  Although "[i]t is not perfectly clear how detailed the moving party must be when 'pointing

25  out' the absence of evidence," 2 Steven S. Gensler, Federal Rules of Civil Procedure, Rules

26  and Commentary, Rule 56, at 159 (2022), the Court is satisfied that Defendants have met

27  that burden here.[23]

28
---
[23]     Dr. Sagers's responsive arguments makes clear that she understood Defendants'
motion as challenging whether she could fulfill the third element of her First Amendment

Turning to the merits, "[i]n order to retaliate against an employee for his speech, an employer must be aware of that speech." *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002). *See also Marr v. Anderson*, 611 F. Supp. 2d 1130, 1142 (D. Nev. 2009), *aff'd*, 374 F. App'x 703 (9th Cir. 2010) ("[T]o establish a genuine and material dispute as to whether the speech was a substantial or motivating factor in the adverse action, the plaintiff must first provide evidence indicating that the defendant was aware of the plaintiff's expressive conduct."); *David Hill Dev., LLC v. City of Forest Grove*, 688 F. Supp. 2d 1193, 1213 (D. Or. 2010) ("To establish retaliatory motive, a plaintiff must prove the defendant had knowledge of the protected conduct . . . ."). Accordingly, for Dr. Panchanathan's decision to have been motivated by Dr. Sagers's protected speech, he must have known about it.

Dr. Panchanathan testified that he was not aware that Dr. Sagers complained about "disparate treatment of men and woman in the department." (Doc. 49-1 at 54.) He also testified that, as a general matter, "if there's anything that an employee is facing that requires them to go to HR, I would never know about it." (*Id.* at 39.) In her response opposing summary judgment, Dr. Sagers contends that Dr. Panchanathan's alleged lack of knowledge about her complaints is "controverted by the record, the timeline of events and the great weight of circumstantial evidence of Dr. Panchanathan's changed behavior and treatment of Dr. Sagers immediately after she complained." (Doc. 54 at 15.)

Context suggests that, by "the timeline of events," Dr. Sagers is referring at least in part to several events related to the office culture discussion—*i.e.*, the climate survey, the consultant's evaluation, and the topics discussed during the KE retreat. But even assuming that these events give rise to a reasonable inference that Dr. Panchanathan knew about Dr. Sagers' "culture of fear" complaint, that complaint was not protected speech under the First

---

retaliation claim as applied to her gender discrimination complaint to Harrington and Kuiper. For example, Dr. Sagers attempts to address the causal relationship between her "statements to Ms. Harrington and Ms. Kuiper reporting negatively about Dr. Panchanathan's illegal conduct" and her demotion by arguing that the "nearly instantaneous" "backlash resulting from Dr. Sagers' reporting to Ms. Harrington and Ms. Kuiper about Dr. Panchanathan's discriminatory, hostile and abusive treatment" establishes that "Dr. Sagers' negative reporting about Dr. Panchanathan was a substantial or motivating factor in Defendants['] adverse employment action against her." (Doc. 54 at 14.)

1  Amendment for the reasons stated earlier in this order.

2      Dr. Sagers also contends that, immediately following her complaints, "Ms. Kuiper
3  curiously began receiving so-called complaints from Dr. Sagers' subordinates, even though
4  such reports by Ms. Kuiper's own admission would not typically be made to her, but to
5  KE's HR Director, Ms. Harrington.  In particular, Ms. Esposito and Ms. Buice allegedly
6  complained to Ms. Kuiper about Dr. Sagers' purported mistreatment of them, behavior
7  which Ms. Kuiper testified neither she nor Dr. Panchanathan had ever seen or heard of
8  before in Dr. Sagers' demeanor and interactions with her subordinates, and that the conduct
9  complained of seemed out of character for Dr. Sagers in her own personal experience with
10 her.  Needless to say the timing of these isolated complaints is telling."  (*Id.*, internal
11 citations omitted.)  Not only did Esposito and Buice speak with HR by October 11, 2019,
12 which is before Dr. Sagers met with Harrington and Kuiper to complain of gender
13 discrimination (*i.e.,* at some point between October 14, 2019 and January 2, 2020), but
14 there is no evidence from which a reasonable factfinder could infer that Esposito's and
15 Kuiper's complaints were related to Dr. Sagers's comments about gender discrimination.
16 "Mere allegation and speculation do not create a factual dispute for purposes of summary
17 judgment."  *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) (citation
18 omitted).

19     As for Dr. Panchanathan's alleged behavioral changes, the same timeline problem
20 exists.  Dr. Sagers asserts that the first behavioral change occurred on September 4, 2019,
21 when "Dr. Panchanathan called a meeting with Dr. Sagers to express his frustration with
22 her that she was not working hard enough to increase the number of small research
23 proposals, of less than $10,000 in value."  (Doc. 54 at 9.  *See also id.* [asserting that the
24 REUs assignment was meant to undermine Dr. Sagers's ability to meet her performance
25 metrics].)  A complaint made between October 14, 2019 and January 2, 2020 could not
26 have caused the alleged behavioral changes that predated the complaint.

27     Accordingly, whether Dr. Panchanathan knew about Dr. Sagers's protected speech
28 is not genuinely disputed—there is no evidence to contradict his testimony that, until this

- 27 -

litigation, he was unaware that Dr. Sagers complained about disparate treatment based on gender. *See also Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751 (9th Cir. 2001) ("[T]here is no evidence in the record to contradict Sweeney's statement in his declaration that he was unaware that Cisneros had made such allegations until this lawsuit was filed. Therefore, there is no evidence that Sweeney was motivated to reassign Cisneros because of the allegations he had made."); *Evans v. Peters*, 2022 WL 827192, *8 (D. Or. 2022) ("Plaintiff has failed to offer any evidence that rises above mere speculation to show Defendants acted out of a retaliatory motive. While timing can be considered as circumstantial evidence of retaliatory intent . . . Plaintiff offers no evidence that the individual Defendants involved in the 2016 Incident actually knew about the 2015 Incident. Consequently, Plaintiff cannot show a connection between his filing a lawsuit and Defendants' adverse actions.") (internal citations omitted).

Thus, Dr. Panchanathan is entitled to summary judgment as to the retaliation component of Dr. Sagers's § 1983 claim—Dr. Sagers has not come forward with sufficient evidence from which a rational juror could find causation.[24]

### B. **Title VII And Title IX**

Based on the same facts underlying her First Amendment retaliation claim against Dr. Panchanathan, Dr. Sagers also asserts retaliation claims against ABOR pursuant to Title VII and Title IX. (Doc. 16 ¶¶ 62-111.)

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee . . . because [she] has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). Similarly, "[r]etaliation against a person because

---

[24] Given this conclusion, it is unnecessary to address Defendants' alternative argument that Dr. Panchanathan is entitled to qualified immunity as to this claim. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

that person has complained of sex discrimination is a form of intentional sex discrimination encompassed by Title IX's private cause of action." *MacIntyre v. Carroll Coll.*, 48 F.4th 950, 954 (9th Cir. 2022) (cleaned up).  Both types of retaliation claims "follow the . . . burden-shifting framework described in *McDonnell Douglas*." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011); *MacIntyre v*, 48 F.4th at 954 (citation omitted).  Thus, "[t]o establish a prima facie case, the employee must show that [she] engaged in a protected activity, [she] was subsequently subjected to an adverse employment action, and that a causal link exists between the two." *Dawson*, 630 F.3d at 936.  "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Id.*  "If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).  "If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.*

Defendants argue that Dr. Sagers's Title VII and Title IX retaliation claims fail because (1) Dr. Sagers did not mention "anything about disparate treatment of men and women at KE" during the August 28, 2019 meeting and, thus, did not engage in a protected activity; and (2) "even if Sagers had complained of gender discrimination, she could not establish that her complaint caused [Dr. Panchanathan] to terminate her VPR appointment because there is no evidence that he knew of her complaint beforehand."  (Doc. 49 at 12-13.)  In response, Dr. Sagers contends that "she engaged in protected activity when she complained about gender discrimination to KE HR Director, Elaina Harrington and to KE Chief of Staff, Adriana Kuiper during the course of several meetings with them that began on August 28, 2019 and continued up to the time of Defendants' decision to demote her."  (Doc. 54 at 15.)  With respect to causation, Dr. Sagers asserts that "Dr. Panchanathan recommended her demotion because of her complaint, and ASU followed his recommendation to demote her."  (*Id.*)

1            1.    <u>Protected Activity</u>

2          "An employee engages in protected activity when she opposes an employment

3   practice that either violates Title VII or that the employee reasonably believes violates that

4   law." *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013).

5   "In the Title IX context, speaking out against sex discrimination is protected activity."

6   *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1121 (9th Cir. 2023).

7          As discussed, there is no evidence that Dr. Sagers mentioned gender discrimination

8   during her August 28, 2019 meeting with Harrington; instead, Dr. Sagers's complaint

9   focused solely on KE's "culture of fear."   Title VII's "opposition clause, by its terms,

10  protects only those employees who oppose what they reasonably perceive as discrimination

11  *under the Act.*"  *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988).  Although

12  "[a]n employee need not establish that the opposed conduct in fact violated the Act in order

13  to establish a valid claim of retaliation," "the opposed conduct must fairly fall within the

14  protection of Title VII to sustain a claim of unlawful retaliation."  *Id.   See also Rollins v.*

15  *McMinnville Sch. Dist. 040*, 2021 WL 5611318, *5 (D. Or. 2021) ("To engage in protected

16  activity that forms the basis for a Title IX retaliation claim, plaintiffs must show they

17  complained about 'sex discrimination.'") (quoting *Jackson v. Birmingham Bd. of Educ.*,

18  544 U.S. 167, 173 (2005)).  Dr. Sagers does not argue that she viewed general concerns

19  about office climate (without any connection to discrimination against a protected class) as

20  implicating Title VII or Title IX, much less explain how such a view would be reasonable.

21  (Doc. 54 at 15-16.)  *See also Noga v. Costco Wholesale Corp.*, 583 F. Supp. 2d 1245, 1262

22  (D. Or. 2008) ("[A] general complaint about a coworker does not amount to a complaint

23  about discrimination."); *Jamal v. Wilshire Mgmt. Leasing Corp.*, 320 F. Supp. 2d 1060,

24  1078-79 (D. Or. 2004) (an employee's complaint that "she and anonymous other

25  employees thought Magee was a bad manager" did not give rise to an inference "that she

26  meant illegal age discrimination").  Thus, Dr. Sagers's August 28, 2019 statement to

27  Harrington was not protected activity under Title VII or Title IX.  *See also Doe 1 v. Nat'l*

28  *Collegiate Athletic Ass'n*, 2023 WL 105096, *17 (N.D. Cal. 2023) (complaints about

"pervasive abuse and bullying, not a sexualized environment that was sex discrimination" "are not actionable under Title IX because they are not protected activity"); *Grenier v. Spencer*, 2013 WL 211130, *9 (E.D. Cal. 2013) ("The fact that an employment practice may be offensive or illegal does not make it discriminatory based on race or gender. The opposition clause, by its terms, protects only those employees who oppose what they reasonably perceive as discrimination *under* [Title VII].") (internal quotation marks and citation omitted). Accordingly, to the extent Dr. Sagers's retaliation claims under Title VII and Title IX arise from the August 28, 2019 conversation, Defendants' request for summary judgment is granted.

In contrast, viewing the evidence in the light most favorable to Dr. Sagers, a rational juror could find that her subsequent statement about gender discrimination to Harrington and Kuiper was protected activity under both Title VII and Title IX.

## 2. Causation

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). The causation standard for Title IX retaliation claims is less clear—although courts generally look to Title VII to evaluate Title IX claims, the Supreme Court in *Nassar* noted distinctions between federal statutes (like Title IX) that operate as "general bars on discrimination" and Title VII, which "is a detailed statutory scheme" that "enumerates specific unlawful employment practices." *Id.* at 355-56. *See generally Doe v. Manor Coll.*, 587 F. Supp. 3d 249, 252-55 (E.D. Pa. 2022) (concluding, after a detailed analysis of the relevant case law, that *Nassar* did not affect the causation standard for retaliation claims under Title IX); *Hunt v. Washoe Cty. Sch. Dist.*, 2019 WL 4262510, *7 (D. Nev. 2019) ("The causation standard to be used for evaluating [Title IX retaliation] claims has not been determined by the Supreme Court, this Circuit, or this District; however, other courts have looked to Title VII to evaluate Title IX claims.").

It is unnecessary in this case to determine the precise causation standard for a Title IX retaliation claim because, even assuming it is less demanding than Title VII's but-for

standard, an employer's awareness is essential to showing a causal link between a protected activity and an adverse action. *See, e.g.*, *Nguyen v. Regents of Univ. of Cal.*, 823 F. App'x 497, 502 (9th Cir. 2020) (plaintiff's "Title IX retaliation claim lacked evidence sufficient to survive summary judgment" because he had not shown "that any Defendant was aware of the allegations in his draft letter or the formal allegation" and, thus, could not "demonstrate a causal connection between these actions and Defendants' conduct"); *Douglas v. DeJoy*, 848 F. App'x 245, 247 (9th Cir. 2021) (under the but-for causation standard, "the decisionmaker's knowledge of [the plaintiff's] EEO activity" is "essential to show causation") (internal quotation marks and citation omitted); *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003), *opinion amended on denial of reh'g*, 2003 WL 21027351 (9th Cir. 2003) (noting, in the context of a pre-*Nassar* Title VII retaliation claim, that to establish a causal relationship, "the plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity"); *Marr*, 611 F. Supp. 2d at 1142 (under a substantial and motivating factor standard, "the plaintiff must first provide evidence indicating that the defendant was aware of the plaintiff's expressive conduct").

Here, it is undisputed that Dr. Panchanathan made the decision to remove Dr. Sagers from the VPR position. (Doc. 49 at 13; Doc. 54 at 15.)[25] However, for the reasons explained in earlier portions of this order, there is no evidence from which a reasonable factfinder could infer that Dr. Panchanathan was aware of Dr. Sagers's statement to Harrington and Kuiper about gender discrimination. Harrington's and Kuiper's awareness is insufficient to establish causation because there is no evidence that either individual participated in the decision to remove Dr. Sagers as VPR. *See, e.g.*, *King v. City of Henderson*, 2023 WL 2552336, *2 (9th Cir. 2023) ("The record does not establish a causal link between Plaintiff's complaints of bias and his reassignment. Indeed, the record does

---

[25]     Dr. Sagers contends that Dr. Panchanathan "recommended that she be demoted from the VPR position" but does not explain to whom this recommendation was made. (Doc. 54 at 15.) She also does not identify any other individual who was involved in the decision-making process.

not show that the superior officers who were responsible for his reassignment even knew about his complaints of colorism to other individuals."); *Reed v. Avis Budget Grp., Inc.*, 472 F. App'x 525, 526 (9th Cir. 2012) ("Reed's retaliation claim for the filing of the DFEH complaint fails because there was no evidence that managers Spain and Stephens, who made the decision not to rehire Reed, knew of the filing of the DFEH complaint.  Human Resources Manager Height, who did know about the complaint, was not a decisionmaker.").[26]

In a related vein, Dr. Sagers contends that ASU was the ultimate "decision maker" and that Harrington's and Kuiper's knowledge may be imputed to ASU such that "at the very least [ASU] should have refused to follow [Dr. Panchanathan's] recommendation to demote Dr. Sagers until after it had investigated what motivated Dr. Panchanathan's recommendation."  (Doc. 54 at 15.)  This argument is foreclosed by *Raad*, in which the Ninth Circuit stated that "[i]n order to prevail, Raad must present evidence from which a reasonable trier of fact could conclude that the school principals who refused to hire her were aware that she had engaged in protected activity."  323 F.3d at 1197.  The court explained that other individuals' awareness of Raad's complaints was insufficient because "[i]mputing knowledge of Raad's protected activity to the principals in this context would be just as inappropriate as imputing knowledge of the race of an applicant in a disparate treatment case when there is no evidence that the employer knew the applicant's race."  *Id.* at 1197-98.  *See also id.* at 1197 ("Raad fails to point to any evidence in the record supporting her assertion that Layral and Thibodeau, the particular principals who made the allegedly retaliatory hiring decisions, in fact were aware of her complaints.  Without any such evidence, there is no genuine issue of material fact."); *Asadi v. Sec'y of Army, Def. Language Inst., Foreign Language Ctr.*, 2023 WL 4626949, *14 (N.D. Cal. 2023)

---

[26]    To the extent it might be theoretically possible to prove causation by showing that Harrington or Kuiper "set[] in motion" Dr. Panchanathan's decision to demote her, *see, e.g.*, *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1060-61 (9th Cir. 2011) (discussing this concept in the context of a False Claims Act retaliation claim), there is no evidence that Harrington or Kuiper influenced Dr. Panchanathan's decision in any way.

(rejecting the plaintiff's causation argument because "it says nothing about why making such complaints would put . . . the two people alleged to have committed the retaliatory acts . . . on notice of the protected activity").

Accordingly, ABOR is entitled to summary judgment as to Dr. Sagers's Title VII and Title IX retaliation claims.  *See also Mobley v. Mayo Clinic Rochester*, 2016 WL 7385038, *11 (D. Ariz. 2016) (granting summary judgment in favor of defendants where "the remaining alleged 2014 complaints were not made to a supervisor, nor has Plaintiff provided any evidence that those who made the decision to terminate Plaintiff were even aware of such complaints").

III.    Discrimination Claims

In Count One, Dr. Sagers alleges that Dr. Panchanathan violated her Fourteenth Amendment rights "when he discriminated against her based on her gender, assigning her tasks that were outside the scope of her employment (and frankly below her qualifications), while the same tasks were not assigned to Dr. Sagers['s] male colleagues such as Dr. Woodbury, who was ultimately promoted into Dr. Sagers['s] position, even though Dr. Sagers was more qualified, had more experience and was outperforming Dr. Woodbury in her metrics."  (Doc. 16 ¶¶ 47, 50.)  In Count Three and Count Four, based on similar facts, Dr. Sagers alleges that she was subjected to disparate treatment based on gender in violation of Title VII and Title IX.  (*Id.* ¶¶ 62-111.)

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Title IX mandates that, with exceptions that are inapplicable here, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The Equal Protection Clause of the Fourteenth Amendment confers "a federal constitutional right to be free from gender discrimination in the workplace at the hands of government actors."  *Bator v. State of Haw.*, 39 F.3d 1021,

1028 (9th Cir. 1994) (internal quotation marks and citation omitted).

"To establish disparate treatment under Title VII, a plaintiff must offer evidence that gives rise to an inference of unlawful discrimination, either through the framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent." *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1228 (9th Cir. 2021) (internal quotation marks and citation omitted). Dr. Sagers's disparate treatment claims under Title IX and the Fourteenth Amendment require similar showings. *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1023-24 (9th Cir. 2018) ("Campbell's Title IX claims for intentional sex discrimination mirror those she raised under Title VII. Indeed, federal courts generally evaluate employment discrimination claims brought under both statutes identically."); *Ballou*, 29 F.4th at 422 (noting that "[t]he central inquiry in an Equal Protection Clause claim is whether a government action was motivated by a discriminatory purpose," which a plaintiff may be establish "by producing direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way," and further noting that "[w]here direct evidence is unavailable, plaintiffs can, and frequently do, rely on the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*") (cleaned up).

Here, the parties agree that the *McDonnell Douglas* framework applies to all three disparate treatment claims. (Doc. 49 at 13-16; Doc. 54 at 16-17.) To establish a prima facie case of disparate treatment under that framework, a plaintiff must show that "(1) the plaintiff belongs to a protected class, (2) he was performing according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 690-91 (9th Cir. 2017). "[T]he requisite degree of proof necessary to establish a prima facie case on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Opara v. Yellen*, 57 F.4th 709, 722 (9th Cir. 2023) (cleaned up). "Once a prima facie case has been shown, the

burden then shifts to the defendant to show a legitimate, nondiscriminatory reason for the challenged actions." *Freyd*, 990 F.3d at 1228. "The burden then returns to the plaintiff, who must show that the proffered nondiscriminatory reason is pretextual." *Id.*

Defendants contend that Dr. Sagers cannot satisfy the fourth prong of her prima facie case because she has not provided "direct evidence of discrimination," shown that "similarly situated individuals outside her protected class were treated more favorably," or identified "other circumstances that give rise to an inference of discriminatory intent." (Doc. 49 at 14.) Defendants also argue that, even if Dr. Sagers can establish a prima facie case, they have articulated a legitimate, nondiscriminatory reason for her demotion (*i.e.*, her deficient performance) and she "cannot establish that [this] reason is a pretext for discrimination." (*Id.* at 16.)

In response, Dr. Sagers asserts in conclusory fashion that she "has established that (1) she belongs to a protected class, (2) she was performing according to her employer's *legitimate* expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." (Doc. 54 at 16, internal quotation marks omitted.) Without providing any additional detail, Dr. Sagers then moves on to pretext, arguing that she "has shown conflicting evidence exists regarding the reasons Defendants contend she was demoted," which "is sufficient to raise genuine issues of material fact as to whether Defendants' purported nondiscriminatory reasons for her demotion are the true reasons." (*Id.* at 17.)

In reply, Defendants reiterate that Dr. Sagers has not shown "that she was treated less favorably than a similarly situated male employee" and contend that, for several reasons, "[h]er pretext arguments are also without merit." (Doc. 57 at 5-8.)

A.     **Prima Facie Case**

As an initial matter, given Dr. Sagers's conclusory description of her prima facie case, the Court relies on the contents of the FAC and the facts section of Dr. Sagers's response brief to understand her theory of disparate treatment. In broad strokes, Dr. Sagers seems to contend that Defendants treated her less favorably than her male counterparts by

instructing her to focus on REUs (which were outside her job description and qualifications and "likely a thinly veiled attempt to prevent her from meeting her performance metrics") and demoting her while retaining Dr. Woodbury (whom she was outperforming).  (Doc. 54 at 4-6, 14.)  Dr. Sagers also contends that, when Dr. Panchanathan left ASU to become the director of NSF, Dr. Woodbury was "appointed over" her to become interim EVP.  (*Id.* at 14.)  Next, to the extent her demotion was based on Esposito's and Buice's complaints,[27] Dr. Sagers argues that she was treated less favorably than Dr. Panchanathan, who "had many complain about their inter-personnel interactions with him, some as serious as gender discrimination, and others as mundane as his 'passive aggressive' approach to communicating with them, among other things," "was subjected to a 360 Peer Review," and "suffered no adverse employment action simply because he was called to answer for his own inter-personnel [sic] difficulties stemming from his interactions with KE Department subordinates."  (*Id.* at 8-9.)  Finally, as evidence of discriminatory animus, Dr. Sagers asserts that two other female ASU employees—Dr. Cantwell and Kuiper—were also subjected to gender discrimination.  (*Id.* at 7-8.)

For several reasons, the Court agrees with Defendants that Dr. Sagers has failed to fulfill the fourth prong of her prima facie case.  First, to the extent Dr. Sagers attempts to proffer Dr. Woodbury as the "similarly situated" male employee who was "treated more favorably," the problem is that Dr. Sagers has failed to identify evidence in the record establishing either that she and Dr. Woodbury were similarly situated or that he received favorable treatment in relation to her.  For example, although Dr. Sagers asserts that her "performance [was] equal to or better than Dr. Woodbury's" (Doc. 54 at 14), she cites no evidence in support of this assertion.  *See* Fed. R. Civ. P. 56(c)(3).  Additionally, the Court's independent review suggests that the one specific piece of evidence in the record bearing on this issue undermines rather than supports Dr. Sagers's position—Dr.

---

[27]    Although Defendants focus on Dr. Sagers's job performance as the reason for her demotion, both Dr. Panchanathan and Dr. Sagers testified that the HR complaints against her were an additional factor in the decision (although they disagree about whether Dr. Panchanathan told Dr. Sagers this fact during the January 2, 2020 meeting).  (Doc. 49-1 at 56; Doc. 54-1 at 20-21.)

Panchanathan testified that he was satisfied with Dr. Woodbury's job performance. (Doc. 49-1 at 65 [Q: "So was he successful? Did he meet your expectations . . . with respect to . . . tier three and tier four prior to your departure?" A: "I would say yes. In terms of preparing for tier three and tier four and getting ready for bigger things, yes."].).

The Court acknowledges that some of the metrics by which Dr. Sagers's performance was deemed deficient—such as total dollar volume of submitted proposals (Doc. 49-1 at 67; Doc. 49-4 at 9)—also reflected proposals in Tiers 3 and 4 (Doc. 54-1 at 21), for which Dr. Woodbury was primarily responsible. Nevertheless, there is no evidence that Dr. Woodbury's performance was measured by the same metrics as Dr. Sagers's performance—instead, Dr. Panchanathan testified that Dr. Woodbury was responsible for "advancing tier three and potentially tier four opportunities" and "getting after some big possibilities that were there around the corner," stated that ASU was "aspiring" to obtain grants falling into Tiers 3 and 4 (while "[m]ost, if not all, of tier one and tier two are at the level of where we are right now as an institution"), and explained that he measured success differently among the tiers. (Doc. 49-1 at 38-39, 63, 71.) Specifically, as for Tier 1, Dr. Panchanathan testified that he considered the number and total dollar volume of submitted proposals, the number of PIs involved in the proposals, and the subjective views of deans and faculty; as for Tier 2, he considered the "number of centers" that ASU was acquiring;[28] and as for Tiers 3 and 4, he looked at "the number of efforts being made" because the "success rates" of proposals for such large projects are "very low." (Doc. 49-1 at 38-39.) Dr. Sagers does not dispute (much less provide evidence that contradicts) this testimony.

Similarly, to the extent Dr. Sagers seeks to satisfy the fourth element of her prima facie case by comparing her job responsibilities (which purportedly "diminished") and Dr. Woodbury's (which purportedly did not) (Doc. 54 at 14), this contention once again is bereft of citations to the record. *See* Fed. R. Civ. P. 56(c)(3). More broadly, Dr. Sagers

---

[28]    *See also* Doc. 49-1 at 39 ("The engineering research centers, the science and technology centers, other centers that are not only focused on science and engineering, and technology-focus only in other areas. . . . And also bringing groups of people to work on a problem, which may be only a $5 million scale but yet is significant.").

fails to offer any meaningful response to Defendants' argument that "Woodbury and Sagers were not similarly situated" because they "had different jobs, duties, experiences, and expectations. Sagers was the VPR, responsible for developing Tier 1 and Tier 2 projects, and the measure of her success was tied to building relationships with faculty and deans and increasing proposal dollar amounts and the number of PIs.  Woodbury was a senior advisor assigned to advancing Tier 3 and, potentially, Tier 4 opportunities, and the measure of his success was tied to building relationships with outside agencies and 'getting ready for bigger things.'  [Dr. Panchanathan] chose Sagers and Woodbury for their respective positions for the 'different kinds of expertise they br[ought] to the table.'"  (Doc. 49 at 15, citations omitted.)

"To establish similarity under the *McDonnell Douglas* framework, the individuals being compared need not be identical; they must only be similar in all material respects." *Ballou*, 29 F.4th at 423 (cleaned up).  "Generally, individuals are similarly situated when they have similar jobs and display similar conduct." *Id.* (internal quotation marks and citation omitted).  Here, given the dearth of cited evidence and developed argument about Dr. Woodbury's performance and how he was treated, Dr. Sagers has failed to meet her burden of coming forward with evidence from which a reasonable juror could infer gender discrimination based on her purportedly differential treatment in relation to Dr. Woodbury.

Dr. Sagers's reliance on Dr. Panchanathan as a comparator fails for similar reasons. For one thing, beyond vague references to one or two past HR complaints about Dr. Panchanathan, there is no evidence in the record about the specifics of those complaints or about the results of Dr. Panchanathan's 360 review and any disciplinary actions taken. Kuiper testified that, on an unidentified date, her then-boyfriend (now-husband), who also works for ASU, complained to HR that Dr. Panchanathan was discriminating against women in the department, including Kuiper.  (Doc. 54-1 at 81-82.)  Kuiper avowed that she did not personally complain, she did not believe the complaint arose from anything she said, and she wasn't sure why he decided to lodge the complaint.  (*Id.* at 82-86.)  She also avowed that, when later asked by HR whether she had been "a target of gender

discrimination by Dr. Panchanathan specifically," she said she had not (and had not witnessed anything of that nature happening to anyone else). (*Id.* at 73, 85.) Finally, Kuiper also testified that, at some point, she mentioned to Dr. Panchanathan that she had been interviewed by HR in relation to her then-boyfriend's complaint and, based on his response, thought "that had happened once before." (*Id.* at 73-74.) However, she could not remember the specifics of his response and did not question him on the topic any further. (*Id.*) Without more information, the mere fact that Dr. Panchanathan was the subject of one or more employee complaints, which were apparently not substantiated, and remained in his position (which was dissimilar to Dr. Sagers's position, given that he was her supervisor) fails to raise a reasonable inference that Dr. Sagers was the target of gender discrimination.

In a related vein, Dr. Sagers's contention that Kuiper is "[a]nother example of the evidence implicating Dr. Panchanathan as a discriminating bully who treated women with hostility and a KE Department female employee's reluctance to report such behavior to Defendants for fear of retaliation" (Doc. 54 at 7) is not supported by Kuiper's testimony. Indeed, Dr. Sagers's characterization of Kuiper as "reluctant" to allege gender discrimination "out of fear of retaliation" (*id.* at 7-8) is mere speculation. *See also Mitchell v. Am. Airlines, Inc.*, 2018 WL 4931718, *4 (D. Ariz. 2018) ("Plaintiff's conclusory assertions about Defendant's actions and motives are insufficient to create a triable issue.").

Dr. Sagers's arguments about Dr. Cantwell, whom Dr. Sagers asserts "was forced out by Dr. Panchanathan's discrimination and mistreatment" (Doc. 54 at 7-8), fail for the same reason. Even when viewed in the light most favorable to Dr. Sagers, the evidence at most establishes that Dr. Cantwell was removed as VPR because she had a "difficult" relationship with Dr. Panchanathan. (Doc. 49-1 at 9.) There is simply no evidence that gender discrimination played any role in her removal.

Accordingly, Dr. Sagers has failed to meet her burden of establishing a prima facie case of disparate treatment based on gender. *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1409 (9th Cir. 1987). *See also Kayky v. The Boeing Co.*, 2016 WL 6525808, *5 (W.D.

Wash. 2016) ("Absent comparator evidence, plaintiff has shown nothing more than that she belongs to a protected group and did not succeed in her position.  No presumption of unlawful discrimination arises in these circumstances.").  For this reason alone, summary judgment is warranted in Defendants' favor on the discrimination components of Counts One, Three, and Four.

### B.   **Pretext**

In an abundance of caution, the Court also notes that, even if Dr. Sagers had managed to present a prima facie case of discrimination, her claims would ultimately fail at the third step of the *McDonnell Douglas* framework.

"Once a prima facie case has been shown, the burden then shifts to the defendant to show a legitimate, nondiscriminatory reason for the challenged actions."  *Freyd*, 990 F.3d at 1228.  "The burden then returns to the plaintiff, who must show that the proffered nondiscriminatory reason is pretextual."  *Id.*

Here, Defendants contend that Dr. Panchanathan removed Dr. Sagers from the VPR position because her job performance was deficient.  (Doc. 49 at 7.)  Defendants' explanation is supported by testimony from Dr. Panchanathan, who avowed that his decision to demote Dr. Sagers was based on the following factors: (1) the decrease in total dollar volume of submitted proposals between 2018 and 2019; (2) the 3% increase in the number of PIs between 2018 and 2019, which he viewed as low given the number of new faculty hired during the same period; (3) Dr. Sagers's failure to work with the deans and faculty, which, in his view, would decrease the "quality" of the proposals submitted and, thus, decrease the proportion that were funded; and (4) Dr. Sagers's failure to pursue as many REUs as he expected.  (Doc. 49-1 at 55, 68, 70-71.)[29]  This is sufficient to meet Defendants' burden at step two of the *McDonnell Douglas* analysis.

---

[29]   The record also includes a data report (generated by an ASU research analyst) that provides "a monthly breakdown and annual total of four categories of information about ASU sponsored research proposals from January 2016 through July 2020 (the most recent month for which data was available at the time).  Those categories were: (1) the total dollar value of proposals submitted; (2) the number of proposals submitted; (3) the number of investigators on proposals submitted; and (4) the number of [PIs] on proposals submitted."  (Doc. 49-4 at 6-7 ¶ 6.)  The accuracy of the report is not disputed.

Thus, the burden returns to Dr. Sagers, who must show that the proffered reason is pretextual.  *Freyd*, 990 F.3d at 1228.  "A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence."  *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1094-95 (9th Cir. 2005).  "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption."  *Id.* at 1095 (cleaned up).  *See also Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2006) ("Although some plaintiffs might discover direct evidence that a defendant's nondiscriminatory justification for an employment decision is a pretext, most will not."). "Circumstantial evidence, in contrast, is evidence that requires an additional inferential step to demonstrate discrimination.  It can take two forms.  First, the plaintiff can make an affirmative case that the employer is biased. . . .  Second, the plaintiff can make his case negatively, by showing that the employer's proffered explanation for the adverse action is 'unworthy of credence.'"  *Coghlan*, 413 F.3d at 1095 (citation omitted).  The distinction between direct and circumstantial evidence "controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment." *Id.*  "[T]he plaintiff need offer very little direct evidence to raise a genuine issue of material fact," whereas circumstantial evidence "must be specific and substantial to defeat the employer's motion for summary judgment."  *Id.* (internal quotation marks and citations omitted).  *See also Brown*, 336 F.3d at 1188 ("Under Ninth Circuit law, circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment.") (cleaned up).

Dr. Sagers contends that she can demonstrate pretext because she "has shown conflicting evidence" about whether she was performing well, which "lends to the unreliability of the proffered reasons for her demotion."  (Doc. 54 at 17.)  She also contends that, to the extent she was demoted because of Esposito's and Buice's complaints, she "has presented evidence of personnel complaints made against Dr. Panchanathan, that resulted in nothing more than a 360 review, and not adverse employment action."  (*Id.*)  In other words, Dr. Sagers seeks to rely on circumstantial evidence of pretext—she attempts to

1   show that Defendants' proffered reasons are unworthy of credence.  Thus, the "specific

2   and substantial" standard applies.

3        "In judging whether [an employer's] proffered justifications were 'false,' it is not

4   important whether they were *objectively* false . . . .   Rather, courts only require that an

5   employer honestly believed its reason for its actions, even if its reason is foolish or trivial

6   or even baseless."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002)

7   (internal quotation marks and citation omitted).  *See also Stewart v. Henderson*, 207 F.3d

8   374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated

9   reason was honest, not whether it was accurate, wise, or well-considered.  We do not sit as

10  a superpersonnel department that reexamines an entity's business decision and reviews the

11  propriety of the decision.") (citation omitted).

12       Here, for context, ASU tracked several metrics related to all submitted research

13  proposals: total dollar amount, number of proposals, number of investigators on proposals,

14  and number of PIs on proposals.  (Doc. 49-4 at 9-10.)  The accuracy of these measurements

15  is not disputed.  Also, the parties agree that, based on an anticipated average success rate

16  of 25% to 30%, Dr. Panchanathan had calculated that ASU would need to increase the total

17  dollar volume of submitted proposals by 20% to 30% annually to achieve ASU's goal of

18  increasing research funding by 7% to 10% (which, in turn, was required to meet the $815

19  million goal by 2025).  (Doc. 49-1 at 57-58.)[30]  Nevertheless, during her deposition, Dr.

20  Sagers admitted that the total dollar volume of submitted proposals *decreased* between

21  2018 and 2019 but then identified various reasons why, in her view, this metric was an

22  imperfect measure of her success.  (Doc. 54-1 at 25-26.  *See also id.* at 27 ["I'm disagreeing

23  with [Dr. Panchanathan's] conclusion that because proposal dollars are not increasing the

24  way he'd like them to that proposal awards and expenditures will also show the same

25

26  [30]     Dr. Sagers disputes the accuracy of this anticipated success rate but agrees that this
    was Dr. Panchanathan's stated goal.  (Doc. 54-1 at 25-26 ["So [Dr. Panchanathan] assumed
27  that because the total dollar amount of proposals had decreased, that the total amount of
    research expenditures would also decrease.· But what we were finding in the data is that
28  the conversion rate from proposal to award was actually increasing, so the total and number
    of proposals could drop and we could still see . . . an increase in research expenditures."].)

trend."].)  Likewise, Dr. Sagers emphasized that the number of submitted proposals had increased (which is not disputed) and noted that the measurements reflected the "entire university" but she was only responsible for Tier 1 and Tier 2 proposals.  (Doc. 54-1 at 21, 24-26.)

The problem with these arguments is that they at most suggest that the metrics Dr. Panchanathan chose to utilize when assessing Dr. Sagers's performance were unwise or ill-considered.  Such a showing is insufficient to establish pretext under Ninth Circuit law. *See, e.g.*, *Villiarimo*, 281 F.3d at 1063; *Shokri v. Boeing Co.*, 311 F. Supp. 3d 1204, 1220-21 (W.D. Wash. 2018), *aff'd*, 777 F. App'x 886 (9th Cir. 2019) ("The record as a whole certainly shows a clash of personalities between Plaintiff and his new manager.  Likewise, the record as a whole demonstrates differing views on Plaintiff's abilities.  However, the Court's role is to remedy discrimination, not to assume the role of a super personnel department[], assessing the merits—or even rationality—of employers' nondiscriminatory business decisions.") (internal citations and quotation marks omitted).

The Court does not discount the possibility that, under the right set of facts, it might be possible to show that the metrics used to justify demoting an employee were so unreasonable that a rational juror could infer pretext from their absurdity alone.  But that is not the case here.  During his deposition, Dr. Panchanathan explained at length why he viewed the relevant metrics as important indicators of success.  (*See, e.g.*, Doc. 49-1 at 67-71.)  In addition to quantitative metrics, Dr. Panchanathan also focused on Dr. Sagers's failure to work effectively with the deans and faculty.  (*Id.* at 68.)  Although Dr. Sagers provides a number of reasons why she disagrees with Dr. Panchanathan's opinions, she does not argue (or provide evidence) that the measures of success he used were particularly unusual or that Dr. Panchanathan himself viewed them as unreasonable (or did not in fact rely upon them).  Instead, her arguments are consistent with the general testimony that Dr. Panchanathan had high (even "outrageous") expectations.  (Doc. 54-1 at 69.  *See also id.* ["Have you ever heard the expression, [s]hoot for the moon and you'll fall among the stars? . . . That's [Dr. Panchanathan]."]; *id.* [describing the "expectations that [Dr. Panchanathan]

levies on everybody else" as "[i]ncredibly challenging"].)

Dr. Sagers also argues that ASU research analyst Hansa Magee "agree[d] that Dr. Sagers was meeting her metrics and she further disagree[d] with Defendants' decision to demote Dr. Sagers when they did." (Doc. 54 at 4.)  However, this assertion is not supported by the record.  Magee testified, in relevant part, that she did not believe Dr. Sagers "understood what she needed to do to be successful in the role as VPR," that it is "really hard to evaluate" high-level administrators because "ASU is just growing so rapidly in a lot of different areas, it's hard to identify the success of one department based on a single person or because the rest of the university is growing very rapidly," and that it would be easier to evaluate the success of someone with a longer tenure. (Doc. 54-1 at 103-04.)  She also testified that it was difficult to speak to Dr. Sagers's effectiveness as VPR, specifically, and that she disagreed with using the data report as "the only metric" of success.  (*Id.* at 104-08.)  But as discussed elsewhere, Dr. Panchanathan did not rely on the data report as his only measure for determining that Dr. Sagers's performance was unsatisfactory. Accordingly, Magee's testimony does not support a reasonable inference that Magee disagreed with Dr. Panchanathan's decision, much less that his proffered justification is pretext for discrimination.

As for Dr. Sagers's argument that the HR complaints against her could not have provided cause for her demotion, this argument fails for two reasons.  First, it is undisputed that she was demoted, at least in large part, because of her job performance.  Thus, the fact that Dr. Panchanathan was not removed from his position as EVP in response to unidentified complaints about his behavior fails to establish pretext. *Curley v. City of North Las Vegas*, 772 F.3d 629, 633 (9th Cir. 2014) ("Disputing only one of several well-supported, independently sufficient reasons for termination is generally not enough to defeat summary judgment.").  Second, and in a related vein, the record does not (for reasons stated earlier in this order) allow for meaningful comparison between Esposito's and Buice's complaints and the unidentified complaints against Dr. Panchanathan.  Likewise, the record does not include any evidence about the results of Dr. Panchanathan's 360

review.  Accordingly, Dr. Sagers has not provided specific and substantial evidence that Defendants' proffered justification for her demotion was pretext.

Finally, all of these conclusions are strengthened by the "same actor inference," which Dr. Sagers conspicuously does not address in her response.  "[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action." *Coghlan*, 413 F.3d at 1096.  "The inference applies to favorable employment actions other than hiring, such as promotion.  It also may arise when the favorable action and termination are as much as a few years apart." *Schechner v. KPIX-TV*, 686 F.3d 1018, 1026 (9th Cir. 2012) (internal citations omitted).  "[T]he point of the same-actor inference is that the evidence rarely is sufficient to find that the employer's asserted justification is false when the actor who allegedly discriminated against the plaintiff had previously shown a willingness to treat the plaintiff favorably." *Coghlan*, 413 F.3d at 1097 (cleaned up).  Here, it is undisputed that Dr. Panchanathan both hired and demoted Dr. Sagers and that the two decisions occurred less than two years apart (in July 2018 and January 2020, respectively).  Thus, the Court agrees with Defendants (Doc. 49 at 16) that they are entitled to the same-actor inference.

Dr. Sagers has not made "the extraordinarily strong showing of discrimination necessary to defeat the same-actor inference." *Coghlan*, 413 F.3d at 1097.  For example, she has not provided meaningful evidence that Dr. Panchanathan harbored discriminatory animus or developed a bias against women during the interval between her hiring and her demotion. *Cf. Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1030, 1058 (D. Or. 2012) ("[T]he key inquiry is whether the individuals involved in the hiring and firing decisions developed a bias during that period.").

…

…

…

…

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 49) is **granted.** The Clerk shall enter judgment accordingly and terminate this action.

Dated this 14th day of August, 2023.

_____
Dominic W. Lanza
United States District Judge